**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| SHARILYN ERVIN,<br><br>Plaintiff(s),<br><br>vs.<br><br>LINCOLN NATIONAL LIFE INSURANCE COMPANY and THE WELLMARK, INC. GROUP DISABILITY INCOME PLAN, WELLMARK, INC. (d/b/a Wellmark Blue Cross and Blue Shield of Iowa); and WELLMARK, INC. WELFARE BENEFIT WRAP-AROUND PLAN,<br><br>Defendant. | No. 4:25-cv-00438-RGE-HCA |

**DECLARATION OF PAULA MCGEE**

I, Paula McGee, declare under penalty of perjury and in accordance with the laws of the State of Iowa, as follows:

1. My name is Paula McGee. I am over the age of 21 years of age, am of sound mind, and am in all ways competent to make this oath. All of the matters expressed herein are true and correct and of my personal knowledge.

2. I serve as Vice President & Senior Counsel for The Lincoln National Life Insurance Company ("Lincoln"). I maintain my office in Tampa, Florida.

3. As part of my duties as Vice President & Senior Counsel, I am responsible for managing litigation brought against Lincoln pertaining to denials of claims for disability benefits, and I serve as a custodian of records pertaining to such litigation. Exhibits 1 and 2 attached to this Affidavit are documents kept by Lincoln in the regular course of business. The documents were transmitted to me in the regular course of business by an employee or

EXHIBIT
A

representative of Lincoln who had personal knowledge of the information, and it is the regular practice of Lincoln to make and/or retain such records. The documents are true and correct duplicates of the originals.

4. Exhibit 1 attached hereto is the Group Disability Income Policy ("Policy"), which is one of the documents that governs the long-term disability plan that Wellmark, Inc. ("Wellmark") offers to its employees, which is the Wellmark, Inc. Long-Term Disability Benefits Plan (the "Wellmark Plan"). The Policy is specific to the Wellmark Plan and is not a governing document for any other disability benefit plan for which Liberty acts as claim administrator or insurer. The Policy is unique and specific to the Wellmark Plan. Lincoln's administration of claims under the Policy is solely limited to claims for benefits from the Wellmark Plan.

5. Lincoln administers claims for disability benefits for thousands of different disability plans. Each disability plan for which Lincoln administers claims has a different and unique policy and/or plan document. From January 1, 2023, to December 31, 2023, Lincoln administered a combined total of 458,346 long term disability claims for these disability plans, all of which were governed by the particular policies applicable to the particular plans.

6. When Lincoln refers a claim for an independent medical review, it does not request that the medical vendor assign the claim to any particular physician or health care specialist. While Lincoln may suggest or request that the independent review be conducted by a physician within a particular specialty, the medical vendor assigns physician(s) with the appropriate experience, certification, specialty or skill to conduct the independent reviews requested by Lincoln. No outside person or entity, including but not limited to Dr. Philip McCarthy, Dr. Colton McCoy, Dr. Thomas Finstein, Dr. Tracey Lewis, Dr. Leila B. Laitman, or

Dr. Syed Rizvi, is vested with authority to make any decisions on claims for benefits such as the one at issue in this action.

7. Lincoln does not provide its employees with any incentive, remuneration, bonuses, awards, achievements, or other recognition based in whole or part upon the denial or termination of claims such as the one submitted by Plaintiff. Moreover, Lincoln regards the compensation paid to its employees to be of the utmost confidential nature. Lincoln prohibits disclosure of information or documents concerning the compensation paid to, or the compensation system used for, any particular employee not only to protect its business interests, but also to protect the privacy interests of the people who perform services for it. Any disclosure of compensation paid or compensation systems constitutes a direct competitive threat and disruption of employee relations.

8. The decisions made by Lincoln concerning Plaintiff's claim for benefits that are the subject of this litigation were made by Christine Colaneri. (initial decision) and Tawnya Valliere. (decision on appeal). There are several parallel layers of supervision for these two persons, which do not conjoin until a very senior level of the company. The only persons who would have been in a position to have any direct involvement in decisions on Plaintiff's claim for benefits were Ms. Colaneri and her direct supervisor and Ms. Valliere and her direct supervisor.

9. Programs and materials reflecting Lincoln employee training and performance reviews are trade secrets of Lincoln and disclosures of the information in such items would harm Lincoln's competitive advantage in the insurance industry. Such items are not disseminated to the general public, insureds, or claimants. Moreover, employee performance reviews contain sensitive and private information of Lincoln employees.

10. Lincoln maintains technical reference tools that are applicable to certain types of claims. The technical reference tools contain proprietary information that is a trade secret of Lincoln and disclosure of these tools to Lincoln's competitors would harm Liberty's competitive advantage in the insurance industry. Lincoln does not disseminate the technical reference tools to the general public, insureds, or claimants. Moreover, no portion of the technical reference tools was part of the claim file for the claim filed by Sharilyn Ervin for benefits from the Wellmark Plan under the Policy. Further as stated in Lincoln's letter to Sharilyn Ervin dated October 9, 2025, upholding its decision to terminate benefits (Exhibit 2 at p. 19), "No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination."

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed this 25th day of August 2026.

______________________________
**PAULA MCGEE**

## NOTICE OF PROTECTION PROVIDED BY
## IOWA LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION

This notice provides a brief summary of the Iowa Life and Health Insurance Guaranty Association (the "Association") and the protection it provides for policyholders. This safety net was created under Iowa law, which determines who and what is covered and the amounts of coverage.

The Association was established to provide protection in the unlikely event that your life, annuity or health insurance company becomes financially unable to meet its obligations and is taken over by its Insurance Department. If this should happen, the Association will typically arrange to continue coverage and pay claims, in accordance with Iowa law, with funding from assessments paid by other insurance companies.

The basic protections provided by the Association are:

- Life Insurance
  - $300,000 in death benefits
  - $100,000 in cash surrender and withdrawal values
- Health Insurance
  - $500,000 in basic hospital, medical-surgical or major medical insurance benefits
  - $300,000 in disability income protection insurance benefits
  - $300,000 in long-term care insurance benefits
  - $100,000 in other types of health insurance benefits
- Annuities
  - $250,000 in annuity benefits, cash surrender and withdrawal values

The maximum amount of protection for each individual, regardless of the number of policies or contracts, is $350,000. Special rules may apply with regard to hospital, medical-surgical and major medical insurance benefits.

**NOTE: Certain policies and contracts may not be covered or fully covered.** If coverage is available, it will be subject to substantial limitations and exclusions. For example, coverage does not extend to any portion(s) of a policy or contract that the insurer does not guarantee, such as certain investment additions to the account value of a variable life insurance policy or a variable annuity contract. There are also various residency requirements under Iowa law.

To learn more about the Association and the protections it provides, as well as those relating to group contracts or retirement plans, please visit the Association's website at www.ialifega.org, or contact:

Iowa Life and Health Insurance
Guaranty Association
700 Walnut Street, Suite 1600
Des Moines, IA 50309
(515) 248-5712

Iowa Insurance Division
330 Maple Street
Des Moines, IA 50319
(515) 281-5705

Information about the financial condition of insurers is available from a variety of sources, including financial rating agencies such as AM Best Company, Fitch Inc., Moody's Investors Service, Inc., and Standard & Poor's. That information may be accessed from the "Helpful Links & Information" page located on the website of the Iowa Insurance Division at www.iid.state.ia.us.

The Association is subject to supervision and regulation by the Commissioner of the Iowa Insurance Division. Persons who desire to file a complaint to allege a violation of the laws governing the Association may contact the Iowa Insurance Division. State law provides that any suit against the Association shall be brought in the Iowa District Court in Polk County, Iowa.

**Insurance companies and agents are not allowed by Iowa law to use the existence of the Association or its coverage to encourage you to purchase any form of insurance. When selecting an insurance company, you should not rely on Association coverage. If there is any inconsistency between this notice and Iowa law, then Iowa law will control.**

# GROUP DISABILITY INCOME POLICY

**Sponsor:** **Wellmark, Inc.**

**Policy Number:** **GF3-840-435301-02**

**Effective Date:** **January 1, 2005**

**Governing Jurisdiction** is **Iowa** and subject to the laws of that State.

**Premiums** are due and payable monthly on the first day of each month.

**Policy Anniversaries** shall occur each January 1st beginning in 2006.

The Lincoln National Life Insurance Company (hereinafter referred to as Lincoln) agrees to pay benefits provided by this policy in accordance with its provisions. This policy provides Long Term Disability coverage.

**PLEASE READ THIS POLICY CAREFULLY FOR FULL DETAILS.**

This policy is a legal contract and is issued in consideration of the Application of the Sponsor, a copy of which is attached, and of the payment of premiums by the Sponsor.

For purposes of this policy, the Sponsor acts on its own behalf or as the Covered Person's agent. Under no circumstances will the Sponsor be deemed the agent of Lincoln.

This policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by The Employee Retirement Income Security Act of 1974 (ERISA) and any subsequent amendments.

The following pages including any amendments, riders or endorsements are a part of this policy.

Signed at Lincoln's Home Office, 1301 S. Harrison Street, Fort Wayne, IN 46802-3425

Secretary

President

**NON-PARTICIPATING**

**Form ADOP**

## TABLE OF CONTENTS


**SECTION 1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **SCHEDULE OF BENEFITS**

**SECTION 2** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DEFINITIONS**

**SECTION 3** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **ELIGIBILITY AND EFFECTIVE DATES**

**SECTION 4** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **DISABILITY INCOME BENEFITS**

**SECTION 5** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **EXCLUSIONS**

**SECTION 6** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TERMINATION PROVISIONS**

**SECTION 7** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **GENERAL PROVISIONS**

**SECTION 8** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **PREMIUMS**

**SECTION 9** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **APPLICATION**

# SECTION 1 - SCHEDULE OF BENEFITS

## ELIGIBILITY REQUIREMENTS FOR INSURANCE BENEFITS

**Minimum Hourly Requirement:**

Employees working a minimum of 20 regularly scheduled hours per week

**Long Term Disability Benefits:**

Class 1: All Employees with annual earnings equal to or greater than $150,000

Class 2: All other Employees

Class 3: All pilots with annual earnings equal to or greater than $150,000

Class 4: All other pilots

**Note:** temporary and seasonal Employees and Employees who are not United States citizens or legal residents working in the United States are not covered under this policy

**Eligibility Waiting Period:**

1. If the Covered Person is employed by the Sponsor on the policy effective date - None

2. If the Covered Person begins employment for the Sponsor after the policy effective date - 1st of the month following 90 days of continuous, Active Employment

**Employee Contributions Required:**

No

**Name of Associated Companies:**

First Administrators, Inc.
512 Main St.
Suite 200
Rapid City, SD 55709-8150 USA

### LONG TERM DISABILITY COVERAGE

**Elimination Period:**

180 days.

**Amount of Insurance:**

Applicable to Class 1, 3:

60.00% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $25,000.00 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

Applicable to Class 2, 4:

60.00% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $7,500.00 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

**Maximum Basic Monthly Earnings on which the Benefit is Based:**

| | |
|---|---|
| Applicable to Class 1, 3: | $41,666.67 |
| Applicable to Class 2, 4: | $12,500.00 |

**Own Occupation Duration:**

Applicable to Class 1, 2:

Maximum Own Occupation

Applicable to Class 3, 4:

12 Month Own Occupation

**LONG TERM DISABILITY COVERAGE** (Continued)

**Minimum Monthly Benefit:**

The Minimum Monthly Benefit is $100.00 or 10.00% of the Covered Person's Gross Monthly Benefit, whichever is greater.

**Maximum Benefit Period:**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65 (but not less than 5 years) |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

# SECTION 2 - DEFINITIONS

In this section Lincoln defines some basic terms needed to understand this policy. The male pronoun whenever used in this policy includes the female.

**"Active Employment"** means the Employee must be actively at work for the Sponsor:

1. on a full-time or part-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

   a. at the Sponsor's usual place of business; or
   b. at a location to which the Sponsor's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled work days);
2. holidays (except when the holiday is a scheduled work day);
3. paid vacations;
4. any non-scheduled work day;
5. an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and
6. an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition).

**"Administrative Office"** means The Lincoln National Life Insurance Company, 100 Liberty Way, Suite 100, Dover, NH 03820-4695.

## SECTION 2 - DEFINITIONS
(Continued)

**"Any Occupation"** means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.

**"Application"** is the document designated in Section 9; it is attached to and is made a part of this policy.

**"Appropriate Available Treatment"** means care or services which are:

1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
2. accessible within the Covered Person's geographical region;
3. provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
4. in accordance with generally accepted medical standards of practice.

**"Basic Monthly Earnings"** means the Covered Person's monthly rate of earnings from the Sponsor in effect immediately prior to the date Disability or Partial Disability begins. However, such earnings will not include bonuses, overtime pay and extra compensation other than commissions. Commissions will be averaged over the lesser of (a) the 12 month period prior to the date Disability begins; or (b) the period of employment.

**"Consumer Price Index"** means the government publication "The Consumer Price Index for Urban Wage Earners and Clerical Workers" provided monthly by the U.S. Department of Labor, or its successor or in the event of no successor a similar Index of comparable purpose chosen by Lincoln.

**"Covered Person"** means an Employee insured under this policy.

**"Disability"** or **"Disabled"** means:

Applicable to Class 1, 2:

a. if the Covered Person is eligible for the Maximum Own Occupation benefit, **"Disability"** or **"Disabled"** means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation.

Applicable to Class 3, 4:

b. i. if the Covered Person is eligible for the 12 Month Own Occupation benefit, **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

**"Disability Benefits under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan due to Disability as defined in that plan; and
2. does not reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan if the Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this policy.)

**"Eligibility Date"** means the date an Employee becomes eligible for insurance under this policy. Eligibility Requirements are shown in the Schedule of Benefits.

**"Eligible Survivor"** means the Covered Person's spouse, if living, otherwise the Covered Person's children under age 25.

**"Eligibility Waiting Period"** means the continuous length of time an Employee must be in Active Employment in an eligible class to reach his Eligibility Date.

**"Elimination Period"** means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

If the Covered Person returns to work for any thirty or fewer days during the Elimination Period and cannot continue, Lincoln will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period.

**"Employee"** means a person in Active Employment with the Sponsor.

**"Enrollment Form"** is the document completed by the Covered Person, if required, when enrolling for coverage. This form must be satisfactory to Lincoln.

# SECTION 2 - DEFINITIONS
(Continued)

**"Extended Treatment Plan"** means continued care that is consistent with the American Psychiatric Association's standard principles of Treatment, and is in lieu of confinement in a Hospital or Institution. It must be approved in writing by a Physician.

**"Family and Medical Leave"** means a leave of absence for the birth, adoption or foster care of a child, or for the care of the Covered Person's child, spouse or parent or for the Covered Person's own serious health condition as those terms are defined by the Federal Family and Medical Leave Act of 1993 (FMLA) and any amendments, or by applicable state law.

**"Gross Monthly Benefit"** means the Covered Person's Monthly Benefit before any reduction for Other Income Benefits and Other Income Earnings.

**"Hospital"** or **"Institution"** means a facility licensed to provide Treatment for the condition causing the Covered Person's Disability.

## SECTION 2 - DEFINITIONS
(Continued)

**"Indexed Basic Monthly Earnings"** means the Covered Person's Basic Monthly Earnings in effect just prior to the date Disability or Partial Disability began adjusted on the first anniversary of benefit payments and each anniversary thereafter.

**"Initial Enrollment Period"** means one of the following periods during which an Employee may first enroll for coverage under this policy:

1. for an Employee who is eligible for insurance on the policy effective date, a period before the policy effective date set by the Sponsor and Lincoln.

2. for an Employee who becomes eligible for insurance after the policy effective date, the period which ends 31 days after his Eligibility Date.

**"Injury"** means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this policy:

1. any Disability which begins more than 60 days after an Injury will be considered a Sickness; and

2. any Injury which occurs before the Covered Person is covered under this policy, but which accounts for a medical condition that arises while the Covered Person is covered under this policy will be treated as a Sickness.

**"Last Monthly Benefit"** means the gross Monthly Benefit payable to the Covered Person prior to his death without any reduction for earnings received from employment.

**"Material and Substantial Duties"** means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

**"Mental Illness"** means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Lincoln will use the replacement chosen or published by the American Psychiatric Association.

**"Monthly Benefit"** means the monthly amount payable by Lincoln to the Disabled or Partially Disabled Covered Person.

**"Non-Verifiable Symptoms"** means the Covered Person's subjective complaints to a Physician which cannot be diagnosed using tests, procedures or clinical examinations typically accepted in the practice of medicine. Such symptoms may include, but are not limited to, dizziness, fatigue, headache, loss of energy, numbness, pain, ringing in the ear, and stiffness.

**"Own Occupation"** means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Lincoln will consider the Covered Person's occupation as it is normally performed in the national economy.

**"Partial Disability" or "Partially Disabled"** means the Covered Person, as a result of Injury or Sickness, is able to:

1. perform one or more, but not all, of the Material and Substantial Duties of his Own Occupation or Any Occupation on an Active Employment or a part-time basis; or

2. perform all of the Material and Substantial Duties of his Own Occupation or Any Occupation on a part-time basis; and

3. earn between 20.00% and 80.00% of his Basic Monthly Earnings.

**"Physician"** means a person who:

1. is licensed to practice medicine and is practicing within the terms of his license; or

2. is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the Treatment is received and is practicing within the terms of his license.

It does not include a Covered Person, any family member or domestic partner.

**"Proof"** means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Lincoln.

**"Regular Attendance"** means the Covered Person's personal visits to a Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat the Covered Person's Disability or Partial Disability.

**"Retirement Benefit under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

2. does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and

3. is payable upon:

   a. early or normal retirement; or
   b. Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

## SECTION 2 - DEFINITIONS
(Continued)

**"Retirement Plan"** means a plan which provides retirement benefits to Employees and which is not funded wholly by Employee contributions. The term shall not include a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock ownership plan, 401(K) or a non-qualified plan of deferred compensation.

**"Schedule of Benefits"** means the section of this policy which shows, among other things, the Eligibility Requirements, Eligibility Waiting Period, Elimination Period, Amount of Insurance, Minimum Benefit, and Maximum Benefit Period.

**"Sickness"** means illness, disease, pregnancy or complications of pregnancy.

**"Sponsor"** means the entity to whom this policy is issued.

**"Sponsor's Retirement Plan"** is deemed to include any Retirement Plan:

1. which is part of any Federal, State, Municipal or Association retirement system; or

2. for which the Employee is eligible as a result of employment with the Sponsor.

**"Substance Abuse"** means alcohol and/or drug abuse, addiction or dependency.

**"Treatment"** means consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether the Covered Person chooses to take them or not, and taking drugs and/or medicines.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

**Eligibility Requirements for Insurance Benefits**

The eligibility requirements for insurance benefits are shown in the Schedule of Benefits.

**Eligibility Date for Insurance Benefits**

An Employee in an eligible class will qualify for insurance on the later of:

1. this policy's effective date; or

2. the day after the Employee completes the Eligibility Waiting Period shown in the Schedule of Benefits.

**Effective Date of Insurance**

Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if the Employee's application or enrollment for insurance is made with Lincoln through the Sponsor in a form or format satisfactory to Lincoln.

An Employee will be insured on his Eligibility Date.

**Delayed Effective Date for Insurance**

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Family and Medical Leave**

An Employee's coverage may be continued under this policy for an approved family or medical leave of absence for up to 12 weeks following the date coverage would have terminated, subject to the following:

1. the authorized leave is in writing;
2. the required premium is paid;
3. the Covered Person's benefit level, or the amount of earnings upon which the Covered Person's benefit may be based, will be that in effect on the date before said leave begins; and
4. continuation of coverage will cease immediately if any one of the following events should occur:
    a. the Covered Person returns to work;
    b. this group insurance policy terminates;
    c. the Covered Person is no longer in an eligible class;
    d. nonpayment of premium when due by the Sponsor or the Covered Person;
    e. the Covered Person's employment terminates.

**Rehire Terms**

If a former Employee is re-hired by the Sponsor within 6 months of his termination date, all past periods of Active Employment with the Sponsor will be used in determining the re-hired Employee's Eligibility Date. If a former Employee is re-hired by the Sponsor more than 6 months after his termination date, he is considered to be a new Employee when determining his Eligibility Date.

**Leave of Absence**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is given a leave of absence.

The Covered Person's coverage will not continue beyond the end of the policy month following the policy month in which the leave of absence begins. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

**Lay-off**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is temporarily laid off..

The Covered Person's coverage will not continue beyond the end of the policy month following the policy month in which the lay-off begins.. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

**Associated Companies**

Companies, corporations, firms or individuals that are subsidiary to, or affiliated with, the Sponsor will be called Associated Companies. The Associated Companies, if any, are listed in the Schedule of Benefits. Employees of Associated Companies will be considered Employees of the Sponsor for purposes of this policy.

As they relate to this policy, all actions, agreements and notices between Lincoln and the Sponsor will be binding on the Associated Companies.

If any Associated Companies cease to be Associated Companies for any reason, its Employees will be deemed to have transferred to a class of Employees not eligible for coverage under this policy.

**Transfer Provision**

In order to prevent loss of coverage for an individual because of transfer of insurance carriers, this policy will provide coverage for certain individuals as follows:

**Failure to be In Active Employment Due to Injury or Sickness:**

Subject to premium payments, this policy will cover individuals who:

1. at the time of transfer are covered under the prior carrier's policy; and
2. are not in Active Employment due to Injury or Sickness on the effective date of this policy.

Benefits will be determined based on the lesser of:

1. the amount of the Disability benefit that would have been payable under the prior policy and subject to any applicable policy limitations; or
2. the amount of Disability benefits payable under this policy. If benefits are payable under the prior policy for the Disability, no benefits are payable under this policy.

**Disability Due to a Pre-Existing Condition**

If an individual was insured under the prior carrier's policy at the time of transfer and was in Active Employment and insured under this policy on its effective date, benefits may be payable for a Disability due to a Pre-Existing Condition.

If the individual can satisfy this policy's Pre-Existing Condition Exclusion, the benefit will be determined according to this policy.

If the individual cannot satisfy this policy's Pre-Existing Condition Exclusion, then:

1. Lincoln will apply the Pre-Existing Condition Exclusion of the prior carrier's policy and;
2. if the individual would have satisfied the prior carrier's pre-existing condition exclusion, giving consideration towards continuous time coverage under this policy; and the prior carrier's policy, the benefit will be determined according to this policy. However, the Maximum Monthly Benefit amount payable under this policy shall not exceed the maximum monthly benefit payable under the prior carrier's policy.

No benefit will be paid if the individual cannot satisfy the Pre-Existing Condition Exclusions of either policy.

# SECTION 4 - DISABILITY INCOME BENEFITS

## LONG TERM DISABILITY COVERAGE

### Disability Benefit

When Lincoln receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Lincoln will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Lincoln Proof of continued:

1. Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon Lincoln's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Lincoln will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage.

The Monthly Benefit will not:

1. exceed the Covered Person's Amount of Insurance; or
2. be paid for longer than the Maximum Benefit Period.

The Amount of Insurance and the Maximum Benefit Period are shown in the Schedule of Benefits.

### Amount of Disability Monthly Benefit

To figure the amount of Monthly Benefit:

1. Take the lesser of:
   a. the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits; or
   b. the Maximum Monthly Benefit shown in the Schedule of Benefits; and then
2. Deduct Other Income Benefits and Other Income Earnings, (shown in the Other Income Benefits and Other Income Earnings provision of this policy), from this amount.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Lincoln, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability**

When Lincoln receives Proof that a Covered Person is Partially Disabled and has experienced a loss of earnings due to Injury or Sickness and requires the Regular Attendance of a Physician, he may be eligible to receive a Monthly Benefit, subject to any other provisions of this policy. To be eligible to receive Partial Disability benefits, the Covered Person may be employed in his Own Occupation or another occupation, must satisfy the Elimination Period and must be earning between 20.00% and 80.00% of his Basic Monthly Earnings.

A Monthly Benefit will be paid for the period of Partial Disability if the Covered Person gives to Lincoln Proof of continued:

1. Partial Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon Lincoln's request and at the Covered Person's expense. In determining whether the Covered Person is Partially Disabled, Lincoln will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Partial Disability, the Injury must occur and Partial Disability must begin while the Employee is insured for this coverage.

**Proportionate Loss Monthly Calculation with Work Incentive Benefit**

For the first 12 Months, the work incentive benefit will be an amount equal to the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits, without any reductions from earnings. The work incentive benefit will only be reduced, if the Monthly Benefit payable plus any earnings exceed 100% of the Covered Person's Basic Monthly Earnings. If the combined total is more, the Monthly Benefit will be reduced by the excess amount so that the Monthly Benefit plus the Covered Person's earnings does not exceed 100% of his Basic Monthly Earnings.

Thereafter, to figure the Amount of Monthly Benefit the formula (A divided by B) x C will be used.

A = The Covered Person's Basic Monthly Earnings minus the Covered Person's earnings received while he is Partially Disabled. This figure represents the amount of lost earnings.

B = The Covered Person's Basic Monthly Earnings.

C = The Monthly Benefit as figured in the Disability provision of this policy plus the Covered Person's earnings received while he is Partially Disabled, (but, not including adjustments under the Cost of Living Adjustment Benefit, if included).

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability** (Continued)

**Proportionate Loss Monthly Calculation with Work Incentive Benefit** (Continued)

On the first anniversary of benefit payments and each anniversary thereafter, for the purpose of calculating the benefit, the term "Basic Monthly Earnings" is:

1. replaced by "Indexed Basic Monthly Earnings"; and

2. increased annually by 7.00%, or the current annual percentage increase in the Consumer Price Index, whichever is less.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Lincoln, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Mental Illness and/or Substance Abuse and/or Non-Verifiable Symptoms Limitation**

The benefit for Disability due to Mental Illness and/or Substance Abuse and/or Non-Verifiable Symptoms will not exceed a combined period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy.

If the Covered Person is in a Hospital or Institution for Mental Illness and/or Substance Abuse at the end of the combined period of 24 months, the Monthly Benefit will be paid during the confinement.

If the Covered Person is not confined in a Hospital or Institution for Mental Illness and/or Substance Abuse, but is fully participating in an Extended Treatment Plan for the condition that caused Disability, the Monthly Benefit will be payable to a Covered Person for up to a combined period of 36 months.

In no event will the Monthly Benefit be payable beyond the Maximum Benefit Period shown in the Schedule of Benefits.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Three Month Survivor Benefit**

Lincoln will pay a lump sum benefit to the Eligible Survivor when Proof is received that a Covered Person died:

1. after Disability had continued for 180 or more consecutive days; and

2. while receiving a Monthly Benefit.

The lump sum benefit will be an amount equal to three times the Covered Person's Last Monthly Benefit.

If the survivor benefit is payable to the Covered Person's children, payment will be made in equal shares to the children, including step children and legally adopted children. However, if any of said children are minors or incapacitated, payment will be made on their behalf to the court appointed guardian of the children's property. This payment will be valid and effective against all claims by others representing or claiming to represent the children.

If there is no Eligible Survivor, the benefit is payable to the estate.

If an overpayment is due to Lincoln at the time of a Covered Person's death, the benefit payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings**

**Other Income Benefits** means:

1. The amount for which the Covered Person is eligible under:

    a. Workers' or Workmen's Compensation Laws;
    b. Occupational Disease Law;
    c. Title 46, United States Code Section 688 (The Jones Act);
    d. any work loss provision in mandatory "No-Fault" auto insurance;
    e. Railroad Retirement Act;
    f. any governmental compulsory benefit act or law; or
    g. any other act or law of like intent.

2. The amount of any Disability benefits which the Covered Person is eligible to receive under:
    a. any other group insurance policy of the Sponsor;
    b. any governmental retirement system as a result of his employment with the Sponsor.

3. The amount of benefits the Covered Person receives under the Sponsor's Retirement Plan as follows:

    a. the amount of any Disability Benefits under a Retirement Plan, or Retirement Benefits under a Retirement Plan the Covered Person voluntarily elects to receive as retirement payment under the Sponsor's Retirement Plan; and
    b. the amount the Covered Person receives as retirement payments when he reaches the later of age 62, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, which the Covered Person received or is eligible to receive.

5. Any amount the Covered Person receives from any unemployment benefits.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings** (Continued)

**Other Income Earnings** means:

1. the amount of earnings the Covered Person earns or receives from any form of employment including severance; and

2. any amount the Covered Person receives from any formal or informal sick leave or salary continuation plan(s).

Other Income Benefits, except retirement benefits, must be payable as a result of the same Disability for which Lincoln pays a benefit. The sum of Other Income Benefits and Other Income Earnings will be deducted in accordance with the provisions of this policy.

**LONG TERM DISABILITY COVERAGE** (Continued)

### Estimation of Benefits

Lincoln will reduce the Covered Person's Disability or Partial Disability benefits by the amount of Other Income Benefits that we estimate are payable to the Covered Person.

The Covered Person's Disability benefit will not be reduced by the estimated amount of Other Income Benefits if the Covered Person:

1. provides satisfactory proof of application for Other Income Benefits;

2. signs a reimbursement agreement under which, in part, the Covered Person agrees to repay Lincoln for any overpayment resulting from the award or receipt of Other Income Benefits;

3. if applicable, provides satisfactory proof that all appeals for Other Income Benefits have been made on a timely basis to the highest administrative level unless Lincoln determines that further appeals are not likely to succeed; and

4. if applicable, submits satisfactory proof that Other Income Benefits have been denied at the highest administrative level unless Lincoln determines that further appeals are not likely to succeed.

Lincoln will not estimate or reduce for any benefits under the Sponsor's pension or retirement benefit plan according to applicable law, until the Covered Person actually receives them.

In the event that Lincoln overestimates the amount payable to the Covered Person from any plans referred to in the Other Income Benefits and Other Income Earnings provision of this policy, Lincoln will reimburse the Covered Person for such amount upon receipt of written proof of the amount of Other Income Benefits awarded (whether by compromise, settlement, award or judgement) or denied (after appeal through the highest administrative level).

### Social Security Assistance

Lincoln may help a Covered Person in applying for Social Security Disability Income Benefits. In order to be eligible for assistance the Covered Person must be receiving a Monthly Benefit from Lincoln. Such assistance will be provided only if Lincoln determines that assistance would be beneficial.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Lump Sum Payments**

Other Income Benefits from a compromise, settlement, award or judgement which are paid to the Covered Person in a lump sum and are meant to compensate the Covered Person for any one or more of the following:

1. loss of past or future wages;
2. impaired earnings capacity;
3. lessened ability to compete in the open labor market;
4. any degree of permanent impairment; and
5. any degree of loss of bodily function or capacity;

will be prorated on a monthly basis as follows:

1. over the period of time such benefits would have been paid if not in a lump sum; or

2. if such period of time cannot be determined, the lesser of:

   a. the remainder of the Maximum Benefit Period; or
   b. 5 years.

**Cost of Living Freeze**

After the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under the Other Income Benefits and Other Income Earnings provision of this policy. This provision does not apply to increases received from any form of employment.

**Prorated Benefits**

For any period for which a Long Term Disability benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis. The rate will be 1/30th for each day for such period of Disability.

**Discontinuation of the Long Term Disability Benefit**

The Monthly Benefit will cease on the earliest of:

1. the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;

2. the date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due;

**LONG TERM DISABILITY COVERAGE** (Continued)

**Discontinuation of the Long Term Disability Benefit** (Continued)

The Monthly Benefit will cease on the earliest of: (Continued)

3. the date the Covered Person refuses to be examined or evaluated at reasonable intervals;

4. the date the Covered Person refuses to receive Appropriate Available Treatment;

5. the date the Covered Person refuses a job with the Sponsor where workplace modifications or accommodations were made to allow the Covered Person to perform the Material and Substantial Duties of the job;

6. the date the Covered Person is able to work in his Own Occupation on a part-time basis, but chooses not to;

7. the date the Covered Person's current Partial Disability earnings exceed 80.00% of his Indexed Basic Monthly Earnings;

   Because the Covered Person's current earnings may fluctuate, Lincoln will average earnings over three consecutive months rather than immediately terminating his benefit once 80.00% of Indexed Basic Monthly Earnings has been exceeded.

8. the date the Covered Person is no longer Disabled according to this policy;

9. the end of the Maximum Benefit Period; or

10. the date the Covered Person dies.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Successive Periods of Disability**

With respect to this policy, **"Successive Periods of Disability"** means a Disability which is related or due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.

A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this policy, a Covered Person:

1. returns to his Own Occupation on an Active Employment basis for less than six continuous months; and

2. performs all the Material and Substantial Duties of his Own Occupation.

To qualify for a Successive Periods of Disability benefit, the Covered Person must experience more than a 20% loss of Basic Monthly Earnings.

Benefit payments will be subject to the terms of this policy for the prior Disability.

If a Covered Person returns to his Own Occupation on an Active Employment basis for six continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. The Covered Person must complete another Elimination Period.

If a Covered Person becomes eligible for coverage under any other group long term disability coverage, this Successive Period of Disability provision will cease to apply to that Covered Person.

# SECTION 5 - EXCLUSIONS

## GENERAL EXCLUSIONS

This policy will not cover any Disability due to:

1. war, declared or undeclared, or any act of war;
2. intentionally self-inflicted injuries, while sane or insane;
3. active Participation in a Riot;
4. the committing of or attempting to commit a felony or misdemeanor;
5. cosmetic surgery unless such surgery is in connection with an Injury or Sickness sustained while the individual is a Covered Person; or
6. a gender change, including, but not limited to, any operation, drug therapy or any other procedure related to a gender change.

No benefit will be payable during any period of Disability that begins while the Covered Person is incarcerated.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the Covered Person, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and fire fighters.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

**LONG TERM DISABILITY COVERAGE**

**Pre-Existing Condition Exclusion**

This policy will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from, a Pre-Existing Condition; and

2. which begins in the first 12 months immediately after the Covered Person's effective date of coverage.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage.

# SECTION 6 - TERMINATION PROVISIONS

**Termination of a Covered Person's Insurance**

A Covered Person will cease to be insured on the earliest of the following dates:

1. the date this policy terminates, but without prejudice to any claim originating prior to the time of termination;

2. the date the Covered Person is no longer in an eligible class;

3. the date the Covered Person's class is no longer included for insurance;

4. the date employment terminates. Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for an Employee absent due to Disability during:

   a. the Elimination Period; and
   b. any period during which premium is being waived.

Lincoln reserves the right to review and terminate all classes insured under this policy if any class(es) cease(s) to be covered.

**Policy Termination**

1. Termination of this policy under any conditions will not prejudice any claim which occurs while this policy is in force.

2. If the Sponsor fails to pay any premium within the grace period, this policy will terminate at 12:00 midnight Standard Time on the last day of the grace period. The Sponsor may terminate this policy by advance written notice delivered to Lincoln at least 31 days prior to the termination date. This policy will not terminate during any period for which premium has been paid. The Sponsor will be liable to Lincoln for all premiums due and unpaid for the full period for which this policy is in force.

3. Lincoln may terminate this policy on any premium due date by giving written notice to the Sponsor at least 31 days in advance if:

   a. the number of Employees insured is fewer than 10; or

   b. less than 100.00% of all the Employees eligible for any non-contributory insurance are insured for it; or

   c. the Sponsor fails:

      i. to furnish promptly any information which Lincoln may reasonably require; or
      ii. to perform any other obligations pertaining to this policy.

4. Lincoln may terminate this policy or any coverage(s) afforded hereunder and for any class of covered Employees on any premium due date after it has been in force for 12 months. Lincoln will provide written notice of such termination to the Sponsor at least 31 days before the termination is effective.

5. Termination may take effect on an earlier date if agreed to by the Sponsor and Lincoln.

# SECTION 7 - GENERAL PROVISIONS

**Assignment**

No assignment of any present or future right or benefit under this policy will be allowed.

**Complete Contract - Policy Changes**

1. This policy is the entire contract. It consists of:

   a. all of the pages; and
   b. the attached signed Application of the Sponsor.

2. This policy may be changed in whole or in part. Only an officer of Lincoln can approve a change. The approval must be in writing and endorsed on or attached to this policy.

3. No other person, including an agent, may change this policy or waive any part of it.

**Conformity with State Statutes**

Any provision of this policy which, on its effective date, is in conflict with the statutes of the governing jurisdiction of this policy is hereby amended to conform to the minimum requirements of such statute.

**Employee's Certificate**

Lincoln will provide a Certificate to the Sponsor for delivery to Covered Persons. It will state:

1. the name of the insurance company and the policy number;
2. a description of the insurance provided;
3. the method used to determine the amount of benefits;
4. to whom benefits are payable;
5. limitations or reductions that may apply;
6. the circumstances under which insurance terminates; and
7. the rights of the Covered Person upon termination of this policy.

If the terms of a Certificate and this policy differ, this policy will govern.

**Examination**

Lincoln, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Lincoln. This right may be used as often as reasonably required.

**Furnishing of Information - Access to Records**

1. The Sponsor will furnish at regular intervals to Lincoln:

   a. information relative to Employees:

      i. who qualify to become insured;
      ii. whose amounts of insurance change; and/or
      iii. whose insurance terminates.

   b. any other information about this policy that may be reasonably required.

   The Sponsor's records which, in the opinion of Lincoln, have a bearing on the insurance will be opened for inspection at any reasonable time.

2. Clerical error or omission will not:

   a. deprive an Employee of insurance;
   b. affect an Employee's Amount of Insurance; or
   c. effect or continue an Employee's insurance which otherwise would not be in force.

**Interpretation of the Policy**

Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Lincoln's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

**Incontestability**

The validity of this policy shall not be contested, except for non-payment of premiums, after it has been in force for two years from the date of issue. The validity of this policy shall not be contested on the basis of a statement made relating to insurability by any person covered under this policy after such insurance has been in force for two years during such person's lifetime, and shall not be contested unless the statement is contained in a written instrument signed by the person making such statement.

**Legal Proceedings**

A claimant or the claimant's authorized representative cannot start any legal action:

1. until 60 days after Proof of claim has been given; or

2. more than one year after the time Proof of claim is required.

**Misstatement of Age**

If a Covered Person's age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon an Employee's age, the amount of the benefit will be the amount an Employee would have been entitled to if his correct age were known.

A refund of premium will not be made for a period more than 12 months before the date Lincoln is advised of the error.

**Notice and Proof of Claim**

1. **Notice**

    a. Notice of claim must be given to Lincoln within 30 days of the date of the loss on which the claim is based. If that is not possible, Lincoln must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to Lincoln.

    b. When written notice of claim is applicable and has been received by Lincoln, the Covered Person will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Covered Person can send to Lincoln written Proof of claim without waiting for the forms.

2. **Proof**

    a. Satisfactory Proof of loss must be given to Lincoln no later than 30 days after the end of the Elimination Period.

    b. Failure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time. Such Proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.

    c. Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to Lincoln within 30 days of the request for such Proof.

Lincoln reserves the right to determine if the Covered Person's Proof of loss is satisfactory.

**Payment of Claims**

The benefit is payable to the Covered Person. But, if a benefit is payable to a Covered Person's estate, a Covered Person who is a minor, or who is not competent, Lincoln has the right to pay up to $2,000 to any of the Covered Person's relatives or any other person whom Lincoln considers entitled thereto by reason of having incurred expense for the maintenance, medical attendance or burial of the Covered Person. If Lincoln in good faith pays the benefit in such a manner, any such payment shall fulfill Lincoln's responsibility for the amount paid.

**Right of Recovery**

Lincoln has the right to recover any overpayment of benefits caused by, but not limited to, the following:

1. fraud;
2. any error made by Lincoln in processing a claim; or
3. the Covered Person's receipt of any Other Income Benefits.

Lincoln may recover an overpayment by, but not limited to, the following:

1. requesting a lump sum payment of the overpaid amount;
2. reducing any benefits payable under this policy;
3. taking any appropriate collection activity available including any legal action needed; and
4. placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis.

It is required that full reimbursement be made to Lincoln within 60 days of such overpayment.

**Statements**

In the absence of fraud, all statements made in any application are considered representations and not warranties (absolute guarantees). No representation by:

1. the Sponsor in applying for this policy will make it void unless the representation is contained in the signed Application; or

2. any Employee in enrolling for insurance under this policy will be used to reduce or deny a claim unless a copy of the Enrollment Form, signed by the Employee if required, is or has been given to the Employee.

**Subrogation and Reimbursement**

When a Covered Person's Injury or Sickness appears to be someone else's fault, benefits otherwise payable under this policy for loss of time as a result of that Injury or Sickness will not be paid unless the Covered Person or his legal representative agree(s):

1. to repay Lincoln for such benefits to the extent they are for losses for which compensation is paid to the Covered Person by or on behalf of the person at fault;

2. to allow Lincoln a lien on such compensation and to hold such compensation in trust for Lincoln; and

3. to execute and give to Lincoln any instruments needed to secure the rights under 1. and 2. above.

Further, when Lincoln has paid benefits to or on behalf of the injured Covered Person, Lincoln will be subrogated to all rights of recovery that the Covered Person has against the person at fault. These subrogation rights will extend only to recovery of the amount Lincoln has paid. The Covered Person must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to Lincoln.

**Workers' Compensation**

This policy and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

# SECTION 8 - PREMIUMS

**Premium Rates**

Lincoln has set the premiums that apply to the coverage(s) provided under this policy. Those premiums are shown in a notice given to the Sponsor with or prior to delivery of this policy.

A change in the initial premium rate(s) will not take effect within the first 24 months except that Lincoln may change premium rates at any time for reasons which affect the risk assumed, including those reasons shown below:

1. a change occurs in the policy design;
2. a division, subsidiary or Associated Company is added to or deleted from this policy;
3. when the number of Covered Persons changes by 15.00% or more from the number insured on this policy's effective date; or
4. a change in existing law which affects this policy.

No premium may be changed unless Lincoln notifies the Sponsor at least 31 days in advance. Premium changes may take effect on an earlier date when both Lincoln and the Sponsor agree.

**Payment of Premiums**

1. All premiums due under this policy, including adjustments, if any, are payable by the Sponsor on or before their due dates at Lincoln's Administrative Office, or to Lincoln's agent. The due dates are specified on the first page of this policy.
2. All payments made to or by Lincoln shall be in United States dollars.
3. If premiums are payable on a monthly basis, premiums for additional or increased insurance becoming effective during a policy month will be charged from the next premium due date.
4. The premium charge for insurance terminated during a policy month will cease at the end of the policy month in which such insurance terminates. This manner of charging premium is for accounting purposes only. It will not extend insurance coverage beyond a date it would have otherwise terminated as shown in the "Termination of a Covered Person's Insurance" provision of this policy.
5. If premiums are payable on other than a monthly basis, premiums for additional, increased, reduced or terminated insurance will cause a prorated adjustment on the next premium due date.
6. Except for fraud and premium adjustments, refunds of premiums or charges will be made only for:
    1. the current policy year; and
    2. the immediately preceding policy year.

## SECTION 8 - PREMIUMS
(Continued)

**Grace Period**

This is the 45 days following a premium due date, other than the first, during which premium payment may be made. During the grace period this policy shall continue in force, unless the Sponsor has given Lincoln written notice 31 days in advance of discontinuance of this policy.

**Waiver of Premium**

Premium payments for a Covered Person are waived during any period for which benefits are payable. If coverage is to be continued, premium payments must be resumed following a period during which they were waived.

# AMENDMENT NO. 1

It is agreed the following changes are hereby made to this policy: GF3-840-435301-02

| Changes | Additions | Deletions |
|---|---|---|
| revised Grace Period | Form ADOP-PRE-2 R(1) | Form ADOP-PRE-2 |

The effective date of this change is June 1, 2006.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 10th day of July, 2006.

Issued to and Accepted by:

Wellmark, Inc.
**Sponsor**

By ______________________________________________
**Signature and Title of Officer**

**The Lincoln National Life Insurance Company**

______________________________________________
Officer of the Company

## AMENDMENT NO. 2

It is agreed the following changes are hereby made to this policy: GF3-840-435301-02

| Changes | Additions | Deletions |
|---|---|---|
| The minimum hourly requirement of 30 hours was removed from Section 1 for First Administrators, Inc. Employees. All Employees must work 20 hours. | Form ADOP-SCH-1 R (1) | Form ADOP-SCH-1 |

The effective date of this change is January 1, 2009.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 5th day of October, 2010.

Issued to and Accepted by:

Wellmark, Inc.
**Sponsor**

By ____________________________________________
**Signature and Title of Officer**

**The Lincoln National Life Insurance Company**

Officer of the Company

# AMENDMENT NO. 3

It is agreed the following changes are hereby made to this policy: GF3-840-435301-02

| Changes | Additions | Deletions |
|---|---|---|
| added classes 3 and 4 to the Long Term Disability policy | Form ADOP-SCH-1 R(2)<br>Form ADOP-SCH-3 R(1)<br>Form ADOP-DEF-3 R(1) | Form ADOP-SCH-1 R(1)<br>Form ADOP-SCH-3<br>Form ADOP-DEF-3 |

The effective date of this change is June 8, 2015.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 11th day of August, 2015.

Issued to and Accepted by:

Wellmark, Inc.
**Sponsor**

By ________________________________________
**Signature and Title of Officer**

**The Lincoln National Life Insurance Company**

________________________________________
Officer of the Company

# AMENDMENT NO. 4

It is agreed the following changes are hereby made to this policy: GF3-840-435301-02

| Changes | Additions | Deletions |
|---|---|---|
| Updated Amount of Insurance and Maximum Basic Monthly Earnings on which the Benefit is Based for Classes 1 and 3 | Form ADOP-SCH-3 R (1) | Form ADOP-SCH-3 |

The effective date of this change is January 1, 2020.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 10th day of December, 2019.

Issued to and Accepted by:

Wellmark, Inc.
**Sponsor**

By ____________________________________________
**Signature and Title of Officer**

**The Lincoln National Life Insurance Company**

____________________________________________
Officer of the Company

<u>**DISCLAIMER**</u>

**Sponsor**: **Wellmark, Inc.**

**Policy Number(s)**: **GF3-840-435301-02**

**Date Provided**: **October 28, 2021**

The following certificate(s) are a true copy of the certificate(s) issued under the policy(ies).

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**

## Wellmark, Inc.

Lincoln/Ervin 00050

# CERTIFICATE OF COVERAGE

The Lincoln National Life Insurance Company welcomes your employer as a client.

**Sponsor:** **Wellmark, Inc.**

**Plan Number:** **GF3-840-435301-02**

**Effective Date:** **January 1, 2005**

When this plan refers to "you" or "your" it means the Employee insured under this plan. This is your Disability Income certificate of coverage as long as you are eligible for insurance and remain insured.

A few words about this certificate of coverage...

It is written in plain English. A few terms and provisions are written as required by insurance law. **PLEASE READ IT CAREFULLY**. If you have any questions about any terms and provisions, please contact the Insurance Administrator at your work location or write to Lincoln. Lincoln will assist you in any way we can to help you understand your benefits.

Also, if the terms of your certificate of coverage and the policy differ, the policy will govern. Your coverage may be terminated or modified in whole or in part under the terms and provisions of the policy.

Dennis R Glass

PRESIDENT

**ADOC-1**

**TABLE OF CONTENTS**

**SECTION 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SCHEDULE OF BENEFITS**

**SECTION 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DEFINITIONS**

**SECTION 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ELIGIBILITY AND EFFECTIVE DATES**

**SECTION 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DISABILITY INCOME BENEFITS**

**SECTION 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . EXCLUSIONS**

**SECTION 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TERMINATION PROVISIONS**

**SECTION 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . GENERAL PROVISIONS**

## SECTION 1 - SCHEDULE OF BENEFITS

**ELIGIBILITY REQUIREMENTS FOR INSURANCE BENEFITS**

**What is the Minimum Hourly Requirement?**

Employees working a minimum of 20 regularly scheduled hours per week

**Who is Eligible for Long Term Disability Benefits?**

Class 2: All other Employees

**Note:** temporary and seasonal Employees and Employees who are not United States citizens or legal residents working in the United States are not covered under this policy

**What is the Eligibility Waiting Period?**

1. If you are employed by the Sponsor on the plan effective date -
   None

2. If you begin employment for the Sponsor after the plan effective date -
   1st of the month following 90 days of continuous, Active Employment

**Are Employee Contributions Required?**

No

**LONG TERM DISABILITY COVERAGE**

**What is the Elimination Period?**

180 days.

**What is the Amount of Insurance Benefits?**

60.00% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $7,500.00 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

**What is the Maximum Basic Monthly Earnings on which the Benefit is Based?** $12,500.00

**What is the Own Occupation Duration?**

Maximum Own Occupation

**LONG TERM DISABILITY COVERAGE** (Continued)

**What is the Minimum Monthly Benefit?**

The Minimum Monthly Benefit is $100.00 or 10.00% of your Gross Monthly Benefit, whichever is greater.

**What is the Maximum Benefit Period?**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65 (but not less than 5 years) |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

## SECTION 2 - DEFINITIONS

In this section Lincoln defines some basic terms needed to understand this plan.

**"Active Employment"** means you must be actively at work for the Sponsor:

1. on a full-time or part-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

    a. at the Sponsor's usual place of business; or
    b. at a location to which the Sponsor's business requires you to travel.

You will be considered actively at work if you were actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled work days);
2. holidays (except when the holiday is a scheduled work day);
3. paid vacations;
4. any non-scheduled work day;
5. an excused leave of absence (except medical leave for your own disabling condition and lay-off); and
6. an emergency leave of absence (except emergency medical leave for your own disabling condition).

**"Administrative Office"** The Lincoln National Life Insurance Company, 100 Liberty Way, Suite 100, Dover, NH 03820-4695.

## SECTION 2 - DEFINITIONS
(Continued)

**"Any Occupation"** means any occupation that you are or become reasonably fitted by training, education, experience, age, physical and mental capacity.

**"Appropriate Available Treatment"** means care or services which are:

1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
2. accessible within your geographical region;
3. provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
4. in accordance with generally accepted medical standards of practice.

**"Basic Monthly Earnings"** means your monthly rate of earnings from the Sponsor in effect immediately prior to the date Disability or Partial Disability begins. However, such earnings will not include bonuses, overtime pay and extra compensation other than commissions. Commissions will be averaged over the lesser of (a) the 12 month period prior to the date Disability begins; or (b) the period of employment.

**"Consumer Price Index"** means the government publication "The Consumer Price Index for Urban Wage Earners and Clerical Workers" provided monthly by the U.S. Department of Labor, or its successor or in the event of no successor a similar Index of comparable purpose chosen by Lincoln.

**"Disability"** or **"Disabled"** means:

during the Elimination Period and until you reach the end of the Maximum Benefit Period, as a result of an Injury or Sickness, you are unable to perform the Material and Substantial Duties of your Own Occupation.

**"Disability Benefits under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan due to Disability as defined in that plan; and

2. does not reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan if the Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this plan.)

**"Eligibility Date"** means the date you become eligible for insurance under this plan. The Eligibility Requirements are shown in the Schedule of Benefits.

**"Eligible Survivor"** means your spouse, if living, otherwise your children under age 25.

**"Eligibility Waiting Period"** means the continuous length of time you must be in Active Employment in an eligible class to reach your Eligibility Date.

**"Elimination Period"** means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

If you return to work for any thirty or fewer days during the Elimination Period and cannot continue, Lincoln will count only those days you are Disabled or Partially Disabled to satisfy the Elimination Period.

**"Employee"** means a person in Active Employment with the Sponsor.

**"Enrollment Form"** is the document completed by you, if required, when enrolling for coverage. This form must be satisfactory to Lincoln.

**"Extended Treatment Plan"** means continued care that is consistent with the American Psychiatric Association's standard principles of Treatment, and is in lieu of confinement in a Hospital or Institution. It must be approved in writing by a Physician.

**"Family and Medical Leave"** means a leave of absence for the birth, adoption or foster care of a child, or for the care of your child, spouse or parent or for your own serious health condition as those terms are defined by the Federal Family and Medical Leave Act of 1993 (FMLA) and any amendments, or by applicable state law.

**"Gross Monthly Benefit"** means your Monthly Benefit before any reduction for Other Income Benefits and Other Income Earnings.

**"Hospital"** or **"Institution"** means a facility licensed to provide Treatment for the condition causing the Covered Person's Disability.

**"Indexed Basic Monthly Earnings"** means your Basic Monthly Earnings in effect just prior to the date Disability or Partial Disability began adjusted on the first anniversary of benefit payments and each anniversary thereafter.

**"Initial Enrollment Period"** means one of the following periods during which you may first enroll for coverage under this plan:

1. if you are eligible for insurance on the plan effective date, a period before the plan effective date set by the Sponsor and Lincoln.
2. if you become eligible for insurance after the plan effective date, the period which ends 31 days after your Eligibility Date.

**"Injury"** means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this plan:

1. any Disability which begins more than 60 days after an Injury will be considered a Sickness; and
2. any Injury which occurs before you are covered under this plan, but which accounts for a medical condition that arises while you are covered under this plan will be treated as a Sickness.

**"Last Monthly Benefit"** means the gross Monthly Benefit payable to you prior to your death without any reduction for earnings received from employment.

**"Material and Substantial Duties"** means responsibilities that are normally required to perform your Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

## SECTION 2 - DEFINITIONS
(Continued)

**"Mental Illness"** means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Lincoln will use the replacement chosen or published by the American Psychiatric Association.

**"Monthly Benefit"** means the monthly amount payable by Lincoln to you if you are Disabled or Partially Disabled.

**"Non-Verifiable Symptoms"** means your subjective complaints to a Physician which cannot be diagnosed using tests, procedures or clinical examinations typically accepted in the practice of medicine. Such symptoms may include, but are not limited to, dizziness, fatigue, headache, loss of energy, numbness, pain, ringing in the ear, and stiffness.

**"Own Occupation"** means your occupation that you were performing when your Disability or Partial Disability began. For the purposes of determining Disability under this plan, Lincoln will consider your occupation as it is normally performed in the national economy.

**"Partial Disability" or "Partially Disabled"** means you, as a result of Injury or Sickness, are able to:

1. perform one or more, but not all, of the Material and Substantial Duties of your Own Occupation or Any Occupation on an Active Employment or a part-time basis; or

2. perform all of the Material and Substantial Duties of your Own Occupation or Any Occupation on a part-time basis; and

3. earn between 20.00% and 80.00% of your Basic Monthly Earnings.

**"Physician"** means a person who:

1. is licensed to practice medicine and is practicing within the terms of his license; or

2. is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the Treatment is received and is practicing within the terms of his license.

It does not include you, any family member or domestic partner.

## SECTION 2 - DEFINITIONS
(Continued)

**"Proof"** means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1. a claim form completed and signed (or otherwise formally submitted) by you claiming benefits;

2. an attending Physician's statement completed and signed (or otherwise formally submitted) by your attending Physician; and

3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Lincoln.

**"Regular Attendance"** means your personal visits to a Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat your Disability or Partial Disability.

**"Retirement Benefit under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

2. does not represent contributions made by you (payments which represent your contributions are deemed to be received over your expected remaining life regardless of when such payments are actually received); and

3. is payable upon:

   a. early or normal retirement; or
   b. Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

## SECTION 2 - DEFINITIONS
(Continued)

**"Retirement Plan"** means a plan which provides retirement benefits to you and which is not funded wholly by your contributions. The term shall not include a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock ownership plan, 401(K) or a non-qualified plan of deferred compensation.

**"Schedule of Benefits"** means the section of this policy which shows, among other things, the Eligibility Requirements, Eligibility Waiting Period, Elimination Period, Amount of Insurance, Minimum Benefit, and Maximum Benefit Period.

**"Sickness"** means illness, disease, pregnancy or complications of pregnancy.

**"Sponsor"** means the entity to whom this policy is issued.

**"Sponsor's Retirement Plan"** is deemed to include any Retirement Plan:

1. which is part of any Federal, State, Municipal or Association retirement system; or
2. for which you are eligible as a result of employment with the Sponsor.

**"Substance Abuse"** means alcohol and/or drug abuse, addiction or dependency.

**"Treatment"** means consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether you choose to take them or not, and taking drugs and/or medicines.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

**Who is Eligible for Coverage?**

The eligibility requirements for insurance benefits are shown in the Schedule of Benefits.

**What is Your Eligibility Date for Insurance Benefits?**

If you are in an eligible class you will qualify for insurance on the later of:

1. this plan's effective date; or
2. the day after you complete the Eligibility Waiting Period shown in the Schedule of Benefits.

**What is Your Effective Date of Insurance?**

Your insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if your application or enrollment for insurance is made with Lincoln through the Sponsor in a form or format satisfactory to Lincoln.

You will be insured on your Eligibility Date.

**When will Your Effective Date of Insurance be Delayed?**

Your effective date of any initial, increased or additional insurance will be delayed if you are not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will begin on the date you return to Active Employment.

**What Happens to Your Coverage During a Family and Medical Leave?**

Your coverage may be continued under this plan for an approved family or medical leave of absence for up to 12 weeks following the date coverage would have terminated, subject to the following:

1. the authorized leave is in writing;
2. the required premium is paid;
3. your benefit level, or the amount of earnings upon which your benefit may be based, will be that in effect on the date before the leave begins; and
4. continuation of coverage will cease immediately if any one of the following events should occur:
   a. you return to work;
   b. this plan terminates;
   c. you are no longer in an eligible class;
   d. nonpayment of premium when due by the Sponsor or you;
   e. your employment terminates.

**What Happens if You are Rehired?**

If you are a former Employee and are re-hired by the Sponsor within 6 months of your termination date, all past periods of Active Employment with the Sponsor will be used in determining your Eligibility Date. If you are a former Employee and are re-hired by the Sponsor more than 6 months after your termination date, you are considered to be a new Employee when determining your Eligibility Date.

**What Happens During Leave of Absence?**

The Sponsor may continue your coverage(s) by paying the required premiums, if you are given a leave of absence.

Your coverage will not continue beyond the end of the policy month following the policy month in which the leave of absence begins. In continuing such coverage under this provision, the Sponsor agrees to treat all covered Employees equally.

**What Happens During Lay-off?**

The Sponsor may continue your coverage(s) by paying the required premiums, if you are temporarily laid off..

Your coverage will not continue beyond the end of the policy month following the policy month in which the lay-off begins.. In continuing such coverage under this provision, the Sponsor agrees to treat all covered Employees equally.

**What Happens if There is a Transfer of Insurance Carriers?**

In order to prevent loss of coverage for you because of transfer of insurance carriers, this plan will provide coverage for you as follows:

**If You are not in Active Employment Due to Injury or Sickness**

Subject to premium payments, this plan will cover you if:

1. at the time of transfer you were covered under the prior carrier's plan; and

2. you are not in Active Employment due to Injury or Sickness on the effective date of this plan.

Benefits will be determined based on the lesser of:

1. the amount of the Disability benefit that would have been payable under the prior plan and subject to any applicable plan limitations; or

2. the amount of Disability benefits payable under this plan. If benefits are payable under the prior plan for the Disability, no benefits are payable under this plan.

**If You are Disabled Due to a Pre-Existing Condition**

If you were insured under the prior carrier's plan at the time of transfer and were in Active Employment and insured under this plan on its effective date, benefits may be payable for a Disability due to a Pre-Existing Condition.

If you can satisfy this plan's Pre-Existing Condition Exclusion, the benefit will be determined according to this plan.

If you cannot satisfy this plan's Pre-Existing Condition Exclusion, then:

1. Lincoln will apply the Pre-Existing Condition Exclusion of the prior carrier's plan; and

2. if you would have satisfied the prior carrier's pre-existing condition exclusion, giving consideration towards continuous time coverage under this plan and the prior carrier's plan, the benefit will be determined according to this plan. However, the Maximum Monthly Benefit amount payable under this plan shall not exceed the maximum monthly benefit payable under the prior carrier's plan.

No benefit will be paid if you cannot satisfy the Pre-Existing Condition Exclusions of either plan.

# SECTION 4 - DISABILITY INCOME BENEFITS

## LONG TERM DISABILITY COVERAGE

### Disability Benefit

### When is Your Disability Benefit Payable?

When Lincoln receives Proof that you are Disabled due to Injury or Sickness and require the Regular Attendance of a Physician, Lincoln will pay you a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this plan. The benefit will be paid for the period of Disability if you give to Lincoln Proof of continued:

1. Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon Lincoln's request and at your expense. In determining whether you are Disabled, Lincoln will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Disability, the Injury must occur and Disability must begin while you are insured for this coverage.

The Monthly Benefit will not:

1. exceed your Amount of Insurance; or
2. be paid for longer than the Maximum Benefit Period.

The Amount of Insurance and the Maximum Benefit Period are shown in the Schedule of Benefits.

### How is Your Amount of Disability Monthly Benefit Figured?

To figure the amount of your Monthly Benefit:

1. Take the lesser of:
   a. your Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits; or
   b. the Maximum Monthly Benefit shown in the Schedule of Benefits; and then
2. Deduct Other Income Benefits and Other Income Earnings, (shown in the Other Income Benefits and Other Income Earnings provision of this policy), from this amount.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Lincoln, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability**

**When is Your Partial Disability Benefit Payable?**

When Lincoln receives Proof that you are Partially Disabled and have experienced a loss of earnings due to Injury or Sickness and require the Regular Attendance of a Physician, you may be eligible to receive a Monthly Benefit, subject to any other provisions of this plan. To be eligible to receive Partial Disability benefits, you may be employed in your Own Occupation or another occupation, must satisfy the Elimination Period and must be earning between 20.00% and 80.00% of your Basic Monthly Earnings.

A Monthly Benefit will be paid for the period of Partial Disability if you give to Lincoln Proof of continued:

1. Partial Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon Lincoln's request and at your expense. In determining whether you are Partially Disabled, Lincoln will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Partial Disability, the Injury must occur and Partial Disability must begin while you are insured for this coverage.

**How is Your Loss of Earnings Partial Disability Benefit Figured using the Proportionate Loss with Work Incentive Monthly Calculation?**

For the first 12 Months, the work incentive benefit will be an amount equal to your Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits, without any reductions from earnings. The work incentive benefit will only be reduced, if the Monthly Benefit payable plus any earnings exceed 100% of your Basic Monthly Earnings. If the combined total is more, the Monthly Benefit will be reduced by the excess amount so that the Monthly Benefit plus your earnings does not exceed 100% of your Basic Monthly Earnings.

Thereafter, to figure the amount of Monthly Benefit the formula (A divided by B) x C will be used.

A = Your Basic Monthly Earnings minus your earnings received while you are Partially Disabled. This figure represents the amount of lost earnings.

B = Your Basic Monthly Earnings.

C = The Monthly Benefit as figured in the Disability provision of this plan plus your earnings received while you are Partially Disabled, (but, not including adjustments under the Cost of Living Adjustment Benefit, if included).

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability** (Continued)

**How is Your Loss of Earnings Partial Disability Benefit Figured using the Proportionate Loss with Work Incentive Monthly Calculation** (Continued)

On the first anniversary of benefit payments and each anniversary thereafter, for the purpose of calculating the benefit, the term "Basic Monthly Earnings" is:

1. replaced by "Indexed Basic Monthly Earnings"; and
2. increased annually by 7.00%, or the current annual percentage increase in the Consumer Price Index, whichever is less.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Lincoln, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Mental Illness, Substance Abuse and/or Non-Verifiable Symptoms Limitation**

**What Limitations will Apply for Mental Illness and/or Substance Abuse and/or Non-Verifiable Symptoms?**

The benefit for Disability due to Mental Illness and/or Substance Abuse and/or Non-Verifiable Symptoms will not exceed a combined period of 24 months of Monthly Benefit payments while you are insured under this plan.

If you are in a Hospital or Institution for Mental Illness and/or Substance Abuse at the end of the combined period of 24 months, the Monthly Benefit will be paid during the confinement.

If you are not confined in a Hospital or Institution for Mental Illness and/or Substance Abuse, but are fully participating in an Extended Treatment Plan for the condition that caused Disability, the Monthly Benefit will be payable to you for up to a combined period of 36 months.

In no event will the Monthly Benefit be payable beyond the Maximum Benefit Period shown in the Schedule of Benefits.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Three month Survivor Benefit**

**What Happens to Your Benefit if You Die?**

Lincoln will pay a lump sum benefit to the Eligible Survivor when Proof is received that you died:

1. after Disability had continued for 180 or more consecutive days; and

2. while receiving a Monthly Benefit.

The lump sum benefit will be an amount equal to three times your Last Monthly Benefit.

If the survivor benefit is payable to your children, payment will be made in equal shares to the children, including step children and legally adopted children. However, if any of said children are minors or incapacitated, payment will be made on their behalf to the court appointed guardian of the children's property. This payment will be valid and effective against all claims by others representing or claiming to represent the children.

If there is no Eligible Survivor, the benefit is payable to the estate.

If an overpayment is due to Lincoln at the time of your death, the benefit payable under this provision will be applied toward satisfying the overpayment.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings**

**What are Your Other Income Benefits and Other Income Earnings?**

**Other Income Benefits** means:

1. The amount for which you are eligible under:

   a. Workers' or Workmen's Compensation Laws;
   b. Occupational Disease Law;
   c. Title 46, United States Code Section 688 (The Jones Act);
   d. any work loss provision in mandatory "No-Fault" auto insurance;
   e. Railroad Retirement Act;
   f. any governmental compulsory benefit act or law; or
   g. any other act or law of like intent.

2. The amount of any Disability benefits which you are eligible to receive under:

   a. any other group insurance plan of the Sponsor;
   b. any governmental retirement system as a result of your employment with the Sponsor.

3. The amount of benefits you receive under the Sponsor's Retirement Plan as follows:

   a. the amount of any Disability Benefits under a Retirement Plan, or Retirement Benefits under a Retirement Plan you voluntarily elect to receive as retirement payment under the Sponsor's Retirement Plan; and
   b. the amount you receive as retirement payments when you reach the later of age 62, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, which you received or are eligible to receive.

5. Any amount you receive from any unemployment benefits.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings** (Continued)

**What are Your Other Income Benefits and Other Income Earnings?** (Continued)

**Other Income Earnings** means:

1. the amount of earnings you earn or receive from any form of employment including severance; and

2. any amount you receive from any formal or informal sick leave or salary continuation plan(s).

Other Income Benefits, except retirement benefits, must be payable as a result of the same Disability for which Lincoln pays a benefit. The sum of Other Income Benefits and Other Income Earnings will be deducted in accordance with the provisions of this policy.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Estimation of Benefits**

**How will Your Benefits be Estimated?**

Lincoln will reduce your Disability or Partial Disability benefits by the amount of Other Income Benefits that we estimate are payable to you.

Your Disability benefit will not be reduced by the estimated amount of Other Income Benefits if you:

1. provide satisfactory proof of application for Other Income Benefits;
2. sign a reimbursement agreement under which, in part, you agree to repay Lincoln for any overpayment resulting from the award or receipt of Other Income Benefits;
3. if applicable, provide satisfactory proof that all appeals for Other Income Benefits have been made on a timely basis to the highest administrative level unless Lincoln determines that further appeals are not likely to succeed; and
4. if applicable, submit satisfactory proof that Other Income Benefits have been denied at the highest administrative level unless Lincoln determines that further appeals are not likely to succeed.

Lincoln will not estimate or reduce for any benefits under the Sponsor's pension or retirement benefit plan according to applicable law, until you actually receive them.

In the event that Lincoln overestimates the amount payable to you from any plans referred to in the Other Income Benefits and Other Income Earnings provision of this plan, Lincoln will reimburse you for such amount upon receipt of written proof of the amount of Other Income Benefits awarded (whether by compromise, settlement, award or judgement) or denied (after appeal through the highest administrative level).

**When May Lincoln Provide Social Security Assistance?**

Lincoln may help you in applying for Social Security Disability Income Benefits. In order to be eligible for assistance you must be receiving a Monthly Benefit from Lincoln. Such assistance will be provided only if Lincoln determines that assistance would be beneficial.

**LONG TERM DISABILITY COVERAGE** (Continued)

**What Happens if You Receive a Lump Sum Payment?**

Other Income Benefits from a compromise, settlement, award or judgement which are paid to you in a lump sum and are meant to compensate you for any one or more of the following:

1. loss of past or future wages;
2. impaired earnings capacity;
3. lessened ability to compete in the open labor market;
4. any degree of permanent impairment; and
5. any degree of loss of bodily function or capacity;

will be prorated on a monthly basis as follows:

1. over the period of time such benefits would have been paid if not in a lump sum; or

2. if such period of time cannot be determined, the lesser of:

   a. the remainder of the Maximum Benefit Period; or
   b. 5 years.

**What Happens if You Receive any Cost of Living Increases?**

After the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under the Other Income Benefits and Other Income Earnings provision of this plan. This provision does not apply to increases received from any form of employment.

**What Happens if Your Benefit Period is Less than a Month?**

For any period for which a Long Term Disability benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis. The rate will be 1/30th for each day for such period of Disability.

**When will Your Long Term Disability Benefits be Discontinued?**

The Monthly Benefit will cease on the earliest of:

1. the date you fail to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;

2. the date you fail to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due;

**LONG TERM DISABILITY COVERAGE** (Continued)

**When will Your Long Term Disability Benefits be Discontinued?** (Continued)

The Monthly Benefit will cease on the earliest of: (Continued)

3. the date you refuse to be examined or evaluated at reasonable intervals;
4. the date you refuse to receive Appropriate Available Treatment;
5. the date you refuse a job with the Sponsor where workplace modifications or accommodations were made to allow you to perform the Material and Substantial Duties of the job;
6. the date you are able to work in your Own Occupation on a part-time basis, but choose not to;
7. the date your current Partial Disability earnings exceed 80.00% of your Indexed Basic Monthly Earnings;

   Because your current earnings may fluctuate, Lincoln will average earnings over three consecutive months rather than immediately terminating your benefit once 80.00% of Indexed Basic Monthly Earnings has been exceeded.
8. the date you are no longer Disabled according to this plan;
9. the end of the Maximum Benefit Period; or
10. the date you die.

**LONG TERM DISABILITY COVERAGE** (Continued)

**Successive Periods of Disability**

**What Happens if You Return to Work and Become Disabled Again?**

With respect to this plan, **"Successive Periods of Disability"** means a Disability which is related or due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.

A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this plan, you:

1. return to your Own Occupation on an Active Employment basis for less than six continuous months; and
2. perform all the Material and Substantial Duties of your Own Occupation.

To qualify for the Successive Periods of Disability benefit, you must experience more than a 20% loss of Basic Monthly Earnings.

Benefit payments will be subject to the terms of this plan for the prior Disability.

If you return to your Own Occupation on an Active Employment basis for six continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. You must complete another Elimination Period.

If you become eligible for coverage under any other group long term disability coverage, this Successive Periods of Disability provision will cease to apply to you.

# SECTION 5 - EXCLUSIONS

## GENERAL EXCLUSIONS

**What Disabilities are Not Covered?**

This plan will not cover any Disability due to:

1. war, declared or undeclared, or any act of war;
2. intentionally self-inflicted injuries, while sane or insane;
3. active Participation in a Riot;
4. the committing of or attempting to commit a felony or misdemeanor;
5. cosmetic surgery unless such surgery is in connection with an Injury or Sickness sustained while you are covered under this plan; or
6. a gender change, including, but not limited to, any operation, drug therapy or any other procedure related to a gender change.

No benefit will be payable during any period of Disability that begins while you are incarcerated.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in your defense, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and fire fighters.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

**LONG TERM DISABILITY COVERAGE**

**Pre-Existing Condition Exclusion**

**What Other Disabilities are Not Covered?**

This plan will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from, a Pre-Existing Condition; and

2. which begins in the first 12 months immediately after your effective date of coverage.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which you were diagnosed or received Treatment within three months prior to your effective date of coverage.

## SECTION 6 - TERMINATION PROVISIONS

**When will Your Insurance End?**

You will cease to be insured on the earliest of the following dates:

1. the date this plan terminates, but without prejudice to any claim originating prior to the time of termination;

2. the date you are no longer in an eligible class;

3. the date your class is no longer included for insurance;

4. the date employment terminates. Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for an Employee absent due to Disability during:

   a. the Elimination Period; and
   b. any period during which premium is being waived.

Lincoln reserves the right to review and terminate all classes insured under this plan if any class(es) cease(s) to be covered.

## SECTION 7 - GENERAL PROVISIONS

**Is Assignment Allowed?**

No assignment of any present or future right or benefit under this policy will be allowed.

**How will Lincoln Conform With State Statutes?**

Any provision of this plan which, on its effective date, is in conflict with the statutes of the governing jurisdiction of this plan is hereby amended to conform to the minimum requirements of such statute.

**What are Lincoln's Examination Rights?**

Lincoln, at its own expense, may have the right and opportunity to have the claimant, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Lincoln. This right may be used as often as reasonably required.

**Who has the Authority for Interpretation of this Plan?**

Lincoln shall possess the authority, in its sole discretion, to construe the terms of this plan and to determine benefit eligibility hereunder. Lincoln's decisions regarding construction of the terms of this plan and benefit eligibility shall be conclusive and binding.

**When can this Plan be Contested?**

The validity of this plan shall not be contested, except for non-payment of premiums, after it has been in force for two years from the date of issue. The validity of this plan shall not be contested on the basis of a statement made relating to insurability by you after such insurance has been in force for two years during your lifetime, and shall not be contested unless the statement is contained in a written instrument signed by you.

**When can Legal Proceedings Begin?**

A claimant or the claimant's authorized representative cannot begin any legal action:

1. until 60 days after Proof of claim has been given; or

2. more than one year after the time Proof of claim is required.

**What Happens if Your Age is Misstated?**

If your age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon your age, the amount of the benefit will be the amount you would have been entitled to if your correct age were known.

A refund of premium will not be made for a period more than 12 months before the date Lincoln is advised of the error.

# SECTION 7 - GENERAL PROVISIONS
(Continued)

**When Must Lincoln be Notified of a Claim?**

1. Notice of claim must be given to Lincoln within 30 days of the date of the loss on which the claim is based. If that is not possible, Lincoln must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to Lincoln.

2. When written notice of claim is applicable and has been received by Lincoln, you will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, you can send to Lincoln written Proof of claim without waiting for the forms.

**When Must Lincoln Receive Proof of Claim?**

1. Satisfactory Proof of loss must be given to Lincoln no later than 30 days after the end of the Elimination Period.

2. Failure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time. Such Proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.

3. Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to Lincoln within 30 days of the request for such Proof.

Lincoln reserves the right to determine if your Proof of loss is satisfactory.

**Who are Claims Paid To?**

The benefit is payable to you. But, if a benefit is payable to your estate, or if you are a minor, or you are not competent, Lincoln has the right to pay up to $2,000 to any of your relatives or any other person whom Lincoln considers entitled thereto by reason of having incurred expense for the maintenance, medical attendance or burial. If Lincoln in good faith pays the benefit in such a manner, any such payment shall fulfill Lincoln's responsibility for the amount paid.

**What are Lincoln's Rights of Recovery?**

Lincoln has the right to recover any overpayment of benefits caused by, but not limited to, the following:

1. fraud;
2. any error made by Lincoln in processing a claim; or
3. your receipt of any Other Income Benefits.

Lincoln may recover an overpayment by, but not limited to, the following:

1. requesting a lump sum payment of the overpaid amount;
2. reducing any benefits payable under this policy;
3. taking any appropriate collection activity available including any legal action needed; and
4. placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis.

It is required that full reimbursement be made to Lincoln.

**How will Statements Made In Your Application Affect Your Coverage?**

In the absence of fraud, all statements made in any application are considered representations and not warranties (absolute guarantees). No representation by:

1. the Sponsor in applying for this plan will make it void unless the representation is contained in the signed Application; or

2. you in enrolling for insurance under this plan will be used to reduce or deny a claim unless a copy of the Enrollment Form, signed by you if required, is or has been given to you.

**What are Lincoln's Rights of Subrogation and Reimbursement?**

When your Injury or Sickness appears to be someone else's fault, benefits otherwise payable under this policy for loss of time as a result of that Injury or Sickness will not be paid unless you or your legal representative agree(s):

1. to repay Lincoln for such benefits to the extent they are for losses for which compensation is paid to you by or on behalf of the person at fault;

2. to allow Lincoln a lien on such compensation and to hold such compensation in trust for Lincoln; and

3. to execute and give to Lincoln any instruments needed to secure the rights under 1. and 2. above.

Further, when Lincoln has paid benefits to or on your behalf, Lincoln will be subrogated to all rights of recovery that you have against the person at fault. These subrogation rights will extend only to recovery of the amount Lincoln has paid. You must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to Lincoln.

**How does the Policy Affect Workers' Compensation?**

This plan and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

**SUMMARY PLAN DESCRIPTION**

Name of Plan: The Wellmark, Inc. Group Disability Income Plan

Plan benefits are provided under the terms of the Group Disability Income Policy No. GF3-840-435301-02 hereinafter referred to as "the policy", issued by The Lincoln National Life Insurance Company, hereinafter referred to as "Lincoln," to the Employer hereinafter referred to as "Sponsor".

Participants Included: See Schedule of Benefits

Name and Address of Sponsor:

Wellmark, Inc.
1331 Grand Avenue
Station 1W408
Des Moines, IA 50309-2901

Who Pays For the Plan: Premiums are paid by the Sponsor.

The cost of the Plan is funded 100% by Employer contributions.

Plan Identification Number:

a. Sponsor IRS Identification No.: 42-0318333

b. Plan No.: 501

Type of Plan: Group Disability Income

Plan Year: January 1st - December 31st

Plan Administrator, Name, Address and Telephone No:

Wellmark, Inc.
1331 Grand Avenue
Station 1W408
Des Moines, IA 50309-2901
(515) 245-4500

Agent for Service of Legal Process on the Plan:

same as above

Type of Administration: Insurer Administration

Funding Arrangement of the Plan: Benefits of the Plan are insured.

**SUMMARY PLAN DESCRIPTION**
(Continued)

**Amendment of the Sponsor's Plan:**

The Plan Sponsor reserves the right to modify, amend or terminate in whole or in part, any or all provisions of the Plan. Amendments to the Plan are to be made by a written resolution adopted in accordance with the established procedures of the Board of Directors. Amendments may be adopted with retroactive effect to the extent permitted by ERISA and the Code.

**Amendment of Lincoln's Policy:**

The policy may be changed in whole or in part by mutual agreement of the Sponsor and Lincoln. Only an Officer of Lincoln can approve a change. The approval must be in writing and endorsed on or attached to the policy. No consent of any participant or any other person referred to in the policy(ies) shall be required to modify, amend, or change the policy(ies).

NOTE: If you cease active employment, see your benefits administrator to determine what arrangements, if any, may be made to continue your coverage beyond the date you cease active employment.

**When May The Policy Terminate?**

1. If the Sponsor fails to pay any premium within the grace period, the policy will automatically terminate at 12:00 midnight of the last day of the grace period. The "grace period" is the 45 days following a premium due date during which premium payment may be paid.

2. The Sponsor may terminate the policy by advance written notice delivered to Lincoln at least 31 days prior to the termination date. But the policy will not terminate during any period for which premium has been paid.

3. Lincoln may terminate the policy on any premium due date by giving written notice to the Sponsor at least 31 days in advance if:

    a. The number of employees insured is less than 10;

    b. less than 100% of the Employees eligible for any non-contributory insurance are insured for it; or

    c. the Sponsor fails:

        i. to furnish promptly any information which Lincoln may reasonably require; or
        ii. to perform any other obligations pertaining to this policy.

4. Termination may take effect on any earlier date when both the Sponsor and Lincoln agree.

No consent of any participant or any other person referred to in the policy(ies) shall be required to terminate the policy(ies).

**SUMMARY PLAN DESCRIPTION**
(Continued)

**What Are Your Rights In The Event Of Policy Termination?**

Termination of the policy under any conditions will not prejudice any payable claim which occurs while the policy is in force.

**What Are Your Rights Under ERISA?**

1. As a participant in this Plan, you are entitled to certain rights and protection under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

    a. Examine, without charge, at the Plan Administrator's office and at other specified locations, all documents governing the Plan, including insurance contracts, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

    b. Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Plan Administrator may make a reasonable charge for the copies.

    c. Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

2. In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit Plan.

3. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

4. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

5. If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

6. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.

**What Are Your Rights Under ERISA?** (Continued)

7. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim is frivolous.

8. If you have any questions about your Plan, you should contact the Plan Administrator.

9. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

**What is the Time Frame For Claim Decisions?**

If your claim is denied, Lincoln will notify you of the adverse decision within a reasonable period of time, but not later than 45 days after receiving the claim. This 45-day period may be extended for up to 30 days, if Lincoln: (1) determines the extension is necessary because of matters beyond the Plan's control, and (2) notifies you, before the end of the 45-day period, why the extension is needed and the expected decision date. If, before the end of the first 30-day extension, Lincoln determines, due to matters beyond the Plan's control, a decision cannot be rendered within that extension period, the determination period may be extended for up to an additional 30 days, provided Lincoln notifies you, before the end of the first 30-day extension period, why the extension is needed and the expected decision date.

The notice of extension shall explain: (1) the standards on which benefit entitlement is based, (2) the unresolved issues that prevent a claim decision, and (3) the additional information needed. You have at least 45 days to provide the information.

The claim determination time frames begin when a claim is filed, without regard to whether all the information necessary to make a claim determination accompanies the filing.

If an extension is necessary because you failed to submit necessary information, the days from the date Lincoln sends you the extension notice until you respond to the request for additional information are not counted as part of the claim determination period.

**What If Your Claim Is Denied?**

Lincoln's notice of denial shall include:

1. The specific reason or reasons for denial with reference to those specific Plan provisions on which the denial is based;

2. A description of any additional material or information necessary to perfect the claim and an explanation of why that material or information is necessary;

3. A description of the Plan's appeal procedures and time frames, including a statement of the claimant's right to bring a civil action under ERISA following an adverse decision on appeal;

4. Either the specific internal rules, guidelines, protocols, standard or other similar criteria of the Plan relied upon in making the adverse determination or, alternatively, a statement that such rules, guidelines, protocols, standards or other similar criteria of the Plan do not exist;

5. If the adverse decision was based on a medical necessity, experimental treatment, or similar exclusion or limit, an explanation of the scientific or clinical judgment for the adverse decision, or a statement that such explanation will be provided free of charge upon request;

6. If applicable, the reason for not following the views of the treating professional, medical or vocational experts, or a disability determination by the Social Security Administration;

7. A statement that you are entitled, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to your claim; and

8. Notice in a culturally and linguistically appropriate manner.

**What Do You Do To Appeal A Claim Denial?**

You, or your authorized representative, may appeal a denied claim within 180 days after you receive Lincoln's notice of denial. You have the right to:

1. Submit to Lincoln, for review, written comments, documents, records, and other information relating to the claim;

2. Request, free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim;

3. A review that takes into account all comments, documents, records, and other information submitted by you, without regard to whether such information was submitted or considered in the initial claim decision;

4. A review that does not afford deference to the initial adverse decision and which is conducted neither by the individual who made the adverse decision nor the person’s subordinate;

5. If the appeal involves an adverse decision based on medical judgment, a review of your claim by a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, and who was neither consulted in connection with the adverse decision nor the subordinate of any such individual;

6. The identification of medical or vocational experts, if any, consulted in connection with the claim denial, without regard to whether the advice was relied upon in making the decision; and

7. A review and reasonable opportunity to respond to any new or additional evidence considered, relied upon, or generated, or any new or additional rationale in support of an adverse decision, before an adverse decision is rendered.

**What Do You Do To Appeal A Claim Denial?** (Continued)

Lincoln will make a full and fair review of your appeal and may require additional documents as it deems necessary in making such a review. A final decision on the review will be made within a reasonable period of time but not later than 45 days following receipt of the written request for review unless Lincoln determines that special circumstances require an extension. In such case, a written notice will be sent to you before the end of the initial 45-day period. The extension notice shall indicate the special circumstances and the date by which Lincoln expects to render the appeal decision. The extension cannot exceed a period of 45 days from the end of the initial period.

The appeal time frames begin when an appeal is filed, without regard to whether all the information necessary to make an appeal decision accompanies the filing.

If an extension is necessary because you failed to submit necessary information, the days from the date of the extension notice until you respond to the request for additional information are not counted as part of the appeal determination period.

Lincoln's notice of denial shall include:

1. The specific reason or reasons for denial with reference to those Plan provisions on which the denial is based;

2. A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of all documents, records, and other information relevant to your claim;

3. A statement describing any voluntary appeal procedures offered by Lincoln and your right to obtain the information about such procedures, and a statement of your right to bring an action under ERISA, including any applicable contractual limitations period that applies to your right to bring such an action and the calendar date on which the contractual limitations period expires;

4. Either the specific internal rules, guidelines, protocols, standard or other similar criteria of the Plan relied upon in making the adverse decision or, alternatively, a statement that such rules, guidelines, protocols, standards or other similar criteria of the Plan do not exist;

5. If the adverse decision was based on a medical necessity, experimental treatment, or similar exclusion or limit, an explanation of the scientific or clinical judgment for the adverse decision, or a statement that such explanation will be provided free of charge upon request;

6. If applicable, the reason for not following the views of the treating professional, medical or vocational experts, or a disability determination by the Social Security Administration; and

7. Notice in a culturally and linguistically appropriate manner.

You and your Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency.

# Lincoln Financial Group® Privacy Practices Notice

The Lincoln Financial Group companies* are committed to protecting your privacy. To provide the products and services you expect from a financial services leader, we must collect personal information about you. We do not sell your personal information to third parties. This Notice describes our current privacy practices. While your relationship with us continues, we will update and send our Privacy Practices Notice as required by law. Even after that relationship ends, we will continue to protect your personal information. You do not need to take any action because of this Notice, but you do have certain rights as described below.

## Information We May Collect And Use

We collect personal information about you to help us identify you as a consumer, our customer or our former customer; to process your requests and transactions; to offer investment or insurance services to you; to pay your claim; to analyze in order to enhance our products and services; to tell you about our products or services we believe you may want and use; and as otherwise permitted by law. The type of personal information we collect depends on your relationship and on the products or services you request and may include the following:

- **Information from you:** When you submit your application or other forms, you give us information such as your name, address, Social Security number; and your financial, health, and employment history. We may also collect voice recordings or biometric data for use in accordance with applicable law.
- **Information about your transactions:** We maintain information about your transactions with us, such as the products you buy from us; the amount you paid for those products; your account balances; and your payment and claims history.
- **Information from outside our family of companies**: If you are applying for or purchasing insurance products, we may collect information from consumer reporting agencies, such as your credit history; credit scores; and driving and employment records. With your authorization, we may also collect information, such as medical information, from other individuals or businesses.
- **Information from your employer**: If your employer applies for or purchases group products from us, we may obtain information about you from your employer or group representative in order to enroll you in the plan.

## How We Use Your Personal Information

We may share your personal information within our companies and with certain service providers. They use this information to process transactions you, your employer, or your group representative have requested; to provide customer service; to analyze in order to enhance our products and services; to gain customer insight; and to inform you of products or services we offer that you may find useful. Our service providers may or may not be affiliated with us. They include financial service providers (for example, third party administrators; broker-dealers; insurance agents and brokers, registered representatives; reinsurers and other financial services companies with whom we have joint marketing agreements). Our service providers also include non- financial companies and individuals (for example, consultants; vendors; and companies that perform marketing services on our behalf). Information we obtain from a report prepared by a service provider may be kept by the service provider and shared with other persons; however, we require our service providers to protect your personal information and to use or disclose it only for the work they are performing for us, or as permitted by law.

When you apply for one of our products, we may share information about your application with credit bureaus. We also may provide information to group policy owners, or their designees (for example, to your employer for employer-sponsored plans and their authorized service providers), regulatory authorities and law enforcement officials, and to other non-affiliated or affiliated parties as permitted by law. In the event of a sale of all or part of our businesses, we may share customer information as part of the sale. **We do not sell or share your information with outside marketers who may want to offer you their own products and services; nor do we share information we receive about you from a consumer reporting agency. You do not need to take any action for this benefit.**

## Security of Information

We have an important responsibility to keep your information safe. We use safeguards to protect your information from unauthorized disclosure. Our employees are authorized to access your information only when they need it to provide you with products, services, or to maintain your accounts. Employees who have access to your personal information are required to keep it confidential. Employees are required to complete privacy training annually.

## Your Rights Regarding Your Personal Information

**Access:** We want to make sure we have accurate information about you. Upon written request we will tell you, within 30 business days, what personal information we have about you. You may see a copy of your personal information in person or receive a copy electronically or by mail, whichever you prefer. We will share with you who provided the information. In some cases we may provide your medical information to your personal physician. We will not provide you with information we have collected in connection with, or in anticipation of, a claim or legal proceeding. If you request a copy of the information, we may charge you a fee for copying and mailing costs. In very limited circumstances, your request may be denied. You may then request that the denial be reviewed.

**Accuracy of Information:** If you feel the personal information we have about you is inaccurate or incomplete, you may ask us to amend the information. Your request must be in writing and must include the reason you are requesting the change. We will respond within 30 business days. If we make changes to your records as a result of your request, we will notify you in writing and we will send the updated information, at your request, to any person who may have received the information within the prior two years. We will also send the updated information to any insurance support organization that gave us the information, and any service provider that received the information within the prior 7 years. If your requested change is denied, we will provide you with reasons for the denial. You may write to request the denial be reviewed. A copy of your request will be kept on file with your personal information so anyone reviewing your information in the future will be aware of your request.

**Accounting of Disclosures:** If applicable, you may request an accounting of disclosures made of your medical information, except for disclosures:

- For purposes of payment activities or company operations;
- To the individual who is the subject of the personal information or to that individual's personal representative;
- To persons involved in your health care;
- For notification for disaster relief purposes;
- For national security or intelligence purposes;
- To law enforcement officials or correctional institutions;
- Included in a limited data set; or
- For which an authorization is required.

You may request an accounting of disclosures for a time period of less than six years from the date of your request.

**Basis for Adverse Underwriting Decision:** You may ask in writing for the specific reasons for an adverse underwriting decision. An adverse underwriting decision is where we decline your application for insurance, offer to insure you at a higher than standard rate, or terminate your coverage.

Your state may provide for additional privacy protections under applicable laws. We will protect your information in accordance with these additional protections.

If you would like to act upon your rights regarding your personal information, please provide your full name, address and telephone number and either email your inquiry to our Data Subject Access Request Team at DSAR@lfg.com or mail to: Lincoln Financial Group, Attn: Corporate Privacy Office, 7C-01, 1300 S. Clinton St., Fort Wayne, IN 46802. The DSAR@lfg.com email address should only be used for inquiries related to this Privacy Notice. For general account service requests or inquiries, please call 1-877-ASK-LINC.

*This information applies to the following Lincoln Financial Group companies:

First Penn-Pacific Life Insurance Company
Lincoln Financial Distributors, Inc.
Lincoln Financial Group Trust Company
Lincoln Investment Advisors Corporation
Lincoln Life & Annuity Company of New York
Lincoln Life Assurance Company of Boston
Lincoln Retirement Services Company, LLC
Lincoln Variable Insurance Products Trust
The Lincoln National Life Insurance Company

The Lincoln National Life Insurance Company
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68103-2578
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-0401

October 9, 2025

Sharilyn M. Ervin
8790 EP TRUE PARKWAY
UNIT 303
WEST DES MOINES, IA 50266

RE: Long Term Disability (LTD) Benefits
Wellmark, Inc.
Claim #: 15665514

Dear Sharilyn:

We reviewed your appeal request for Long Term Disability ("LTD") benefits and maintained the decision to deny benefits beyond December 26, 2024.

**Initial Claim Decision**

You initially submitted a claim for your absence from work as of November 15, 2023, as a result of neck pain. Information received during the initial claim evaluation also documents diagnoses of gaze convergence palsy, convergence insufficiency, hypertensive retinopathy, Gerd, major depression, and migraine headache. LTD benefits were approved from May 13, 2024 through December 26, 2024. Benefits beyond December 26, 2024 were denied as the evaluation concluded you were no longer disabled as defined by the Policy.

The basis for the decision was outlined in a letter dated December 31, 2024. You were provided an opportunity to request an appeal review of the denial, stating the reasons why you felt that your claim should not have been denied, and submit additional information to support your claim. Specifically, you were advised to submit the following information: "*Office notes, test results, procedure notes, hospital records, ophthamology records, Ear/Nose/Throat records, psychotherapy records from DMOS Orthopedics, Univ. of IA Hospitals, Dr. Breuer, Dr. Magee, Dr. Schissel and any other treating providers from August 28, 2024 through the date of your appeal.*"

**Appeal**

We received your request for reconsideration on June 16, 2025. In your letter of appeal, you stated that your previous employer Wellmark did not provide reasonable accommodations including part time work. You asserted that you cannot satisfy your own occupation according to the LTD policy. You stated that you were not given the opportunity to work a modified schedule and ADA requests were denied. You stated that Lincoln abruptly stopped benefits in January 2025 when medical issues had not been resolved. You stated that Lincoln also did not ask your providers if you could

EXHIBIT
2

work 8 hours in front of a computer screen. You discussed concerns regarding Lincoln reporting not receiving paperwork that your providers had sent. You indicated that in the denial letter Lincoln stated that feedback from your providers was not received, however, you advised you were not advised of this before benefits were denied. You discussed concerns regarding medical specialists reviewing your claim and their familiarity with the details of your job description and screen time required. You reported that your previous employer, Wellmark interfered with your medical appointments. You stated that you do not think it is reasonable to conclude that you can work for 8 hours a day in front of a computer when screentime is a contributing to factor to your symptoms such as nausea, double vision, migraines, vertigo, neck stiffness, eye pain, and ear pain. You stated this affects your days and causes a "crash and burn scenario followed by fatigue." You stated your daily living is affected "intensely when working in front of a computer 40 hours a week." You requested that your benefits "be permitted during the own occupation period." You reported you are also currently dealing with fatigue and will undergo a sleep test for sleep apnea in the next couple of weeks. Further you reported you were scheduled to see a neuro specialist at University of Iowa in September 2025. You stated that your appeal included copies of "many research documents" that you were asked to review to better understand your symptoms.

Additional documentation received in support of your appeal included in part:

- Progress note dated April 10, 2025 from Dr. Dawn Schissel, with Jordan Creek Family Medicine Clinic, PC
- Letter dated April 11, 2025 from Dr. Dawn Schissel
- Testing dated June 04, 2025 by Megan Asklof, Audiologist II with Iowa Health Care
- Office Visit note dated June 04, 2025 with Kara Pasker with Medical Center University - Otolaryngology
- Calendars for January 2025 – mid June 2025 with dots marking the dates you reported experiencing a migraine
- Numerous medical articles, presentations, medical books (DSM-IV, Clinician's Handbook of Prescription Drugs, Comprehensive Medical Terminology Third Edition, Stedman's Medical Dictionary, etc.)
- Copy of your claim file with Lincoln
- Copy of the Complaint filed against Wellmark, Inc. with United States District Court Southern District of Iowa Central Division

This appeal review and analysis considered all the medical and claim documentation contained in your Long Term Disability administrative record, whether or not specifically referenced in this document.

**Appeal Evaluation**

During the ongoing claim evaluation, you were provided a letter dated December 31, 2024, regarding the denial of continued Long Term Disability benefits. Please refer to this letter for the details of the ongoing claim evaluation and denial of benefits beyond December 26, 2024.

During the review of your appeal, your claim was referred for review by Dr. Thomas Finstein, an independent physician Board Certified in Psychiatry. Following a review of the available medical records, the clinical review by Dr. Finstein concluded the evidence does not support functional impairment that translates into restrictions and limitations from a psychiatric perspective from

December 27, 2024 to present. Further the clinical review by Dr. Finstein stated in part,

> *… The claimant has no psychiatric or behavioral health visits during this time period.*
>
> *Previous documentation on 03/25/2024 shows an initial visit for therapy due to anxiety and stress, but the claimant's focus is mostly on their medical conditions. There are no positive findings on the mental status exam (MSE), and the claimant was recommended to follow up with bi-weekly therapy. The documentation does not show any follow-up visits.*
>
> *Office visit notes on 08/27/2024 and 09/23/2024 show similar findings: largely unremarkable mental status examination with no indication of severe psychiatric symptoms or functional impairment from these symptoms. Therefore, the available evidence does not support any impairment from a psychiatric perspective. The claimant is not actively engaged in treatment, and there are no positive mental status exam (MSE) findings or deficits noted.*
>
> *The most recent visit to their primary care manager (PCM) was for disability letter for issues with the screen due to migraines, and the note indicates no symptoms of anxiety, depression, or sleep disturbances.*
>
> *While the records do not support psychiatric impairment, the claimant has a number of other medical conditions that could be causing impairment, but I will defer to my colleagues in those fields.*
>
> *Taking into consideration the entire clinical picture, including evidence-based medicine and any medication or other treatment side effects, the evidence does not support functional impairment that translates into restrictions and limitations (R/LS) from a psychiatric perspective from 12/27/2024 to the present.*
>
> *… the medical management recommended by the provider and/or followed by the claimant is clinically reasonable and consistent with the apparent level of severity for the reported condition. However, the notes and documentation do not indicate the claimant has severe psychiatric conditions.*
>
> *However, it would be expected for a claimant with severe psychiatric symptoms that are causing restrictions and limitations (R/LS) that are preventing the claimant from working to be followed closely by a psychiatrist and be seen for routine therapy. The claimant is being seen infrequently and has not followed up with two therapists after the initial visit.*

During the appeal evaluation, your file was also referred for a panel review by Dr. Philip McCarthy, an independent physician Board Certified in Neurology and Dr. Colton McCoy, an independent physician Board Certified in Ophthalmology.

Following a review of the available medical evidence on file, the clinical review by Dr. McCarthy concluded the medical records do not support restrictions or limitations in the timeframe of review as December 27, 2024 to present. Further the review by Dr. McCarthy stated in part,

> *Taking into consideration the entire clinical picture, including evidence-based medicine*

*and any medication or other treatment side effects, there is no supported level of impairment, which translates into restrictions and limitations from 12/27/2024 to the present. From a neurology standpoint, the diagnosis of vestibular migraines is being managed with medication, there is no description of the frequency, severity, or duration of headaches, or additional clinical information including if medications are helpful. There are multiple not optimized doses of medications which may be used in treating migraines, it is unclear from the medical documentation if these medications are being taken, if they have failed, if therapy has been escalated.*

*I will defer to ophthalmology in regard to computer vision syndrome and convergence insufficiency.*

*The appeal letter states the claimant works on a computer all day and that this is causing neck pain, shoulder pain, eye pain, arm pain. There is a recommendation for vision therapy. The appeal letter states "[Dr. Chen] lied to insurance saying there was no convergence."*

*There is documentation on 04/11/2025 from Dr. Schissel stating a history of migraine headaches. There is an indication of Ubrelvy, which is a rescue medication, and ENT started nortriptyline on 06/05/2025 for vestibular migraine. However, on 04/10/2025, there is an indication of Topamax, Ubrelvy, Sumatriptan, Metoprolol, Duloxetine, and carbamazepine as medications the claimant is using.*

*There is no medical evidence to substantiate the claim of left wrist fracture or carpal tunnel syndrome.*

An unsigned Authorization form received from you in May 2024 noted the following: *"Please send any forms to my email for my providers to avoid delays Also please contact me as I request to be on phone calls to my doctors S.E"* Therefore, during the appeal evaluation, we requested that the reviewing physicians prepare any questions they had for your providers in writing to be shared with you to facilitate a response.

In the review completed by independent neurologist, Dr. McCarthy, he posed the following questions to be shared with your providers:

*What is the duration, frequency, and severity of migraines, vestibular migraines, and headaches (HA)?*

*Are medications helpful in managing headaches (HA)? Is the claimant compliant with medications for migraine? If so, why are there multiple medications with low doses for migraine prevention?*

*Are there headaches (HA) outside of computer use?*

Based on a review of the available medical evidence, the clinical review by independent ophthalmology physician, Dr. Colton McCoy concluded the following,

*Based on the totality of the clinical evidence from 12/27/2024 to the present, there is*

*insufficient support for any formal medical restrictions or limitations that would preclude the claimant from performing full-time work. While the claimant has a well-documented history of convergence insufficiency and associated computer vision syndrome (CVS), these conditions generally do not result in disabling functional limitations when appropriately managed. Visual acuity is repeatedly documented as 20/20 or near 20/20 in both eyes, with normal extraocular movements and unremarkable slit lamp and funduscopic exams across multiple visits. Although the claimant reports symptoms such as eye strain, blurry vision, dizziness, and headaches during extended screen use, these are subjective complaints and not corroborated by clinical findings of functional impairment.*

*Evidence-based management of convergence insufficiency includes behavioral vision therapy, ergonomic modifications, and use of corrective lenses, all of which the claimant has attempted. The recommendations from multiple providers, including Drs. Magee, Lock, Linville, and Berg, emphasize limiting screen time, taking breaks, and pursuing vision therapy but do not provide evidence that the claimant is unable to work in any capacity. The attending physician's statement recommending restrictions comes from Dr. Schissel; however, this opinion appears to be based on the claimant's report rather than quantifiable impairment and is not supported by concurrent examination findings or functional testing from Dr. Schissel.*

*Taking into account the entire clinical picture and principles of evidence-based medicine, there is no supported level of impairment that would necessitate restrictions on core occupational tasks outside of reasonable accommodations such as scheduled screen breaks, workstation adjustments, or possibly flexible work hours. These accommodations are consistent with standard management of computer vision syndrome and convergence insufficiency but do not amount to medically necessary work restrictions or limitations. The claimant's condition is expected to be stable with appropriate non-invasive therapy. Reassessment may be considered in 3-4 months following completion of recommended vision therapy, though continued work with accommodations remains medically appropriate in the interim.*

*…the medical evidence supports that the claimant has the ability to sustain full-time capacity (8 hours/day, 5 days/week) from 12/27/2024 to the present, within reasonable accommodations related to screen use. While the claimant has been diagnosed with convergence insufficiency and has reported symptoms such as eye strain, headaches, and visual discomfort particularly with prolonged computer use, objective findings throughout the record, including normal visual acuity, normal ocular motility, and unremarkable slit lamp and fundus exams, do not support a level of functional impairment that would preclude full-time work.*

*Vision therapy has been recommended as a treatment option, and reasonable accommodations such as regular breaks, use of specialized computer glasses, and ergonomic adjustments may be appropriate; however, these do not equate to medically necessary work-hour restrictions. Therefore, the available evidence supports the claimant's ability to maintain full-time work capacity within the context of these accommodations.*

Dr. McCoy's questions for your providers included the following:

*Can you confirm whether convergence insufficiency remains an active, impairing diagnosis as*

*of 12/27/2024 to the present, and if so, please describe the severity of the condition and any current objective findings supporting continued impairment?*

*Are there any specific, measurable restrictions and limitations (R/Ls) that you believe are medically necessary at this time or were necessary during the period starting 12/27/2024? If so, please describe them (e.g., maximum duration of screen time per day, required breaks, postural limitations).*

*Do you believe the claimant is capable of sustaining full-time work (8 hours/day, 5 days/week) with reasonable accommodations (e.g., blue light filtering glasses, scheduled screen breaks)? If not, please explain why and include clinical findings to support this.*

*What is the current treatment plan for convergence insufficiency or any other vision-related complaint (e.g., vision therapy, medications, ergonomic recommendations), and how long is this plan expected to continue? Do you anticipate improvement with continued treatment?*

*If you recommended any absence from work, please clarify what clinical findings or impairments warranted that absence and during what time frame.*

During the appeal evaluation, your file was reviewed by a Board Certified Vocational Expert who completed an Occupational Analysis in order to compare your job as a Customer Experience Advocate I to the occupation in the national economy of Policyholder Information Clerk. The analysis showed your occupation is most often performed at the Sedentary level physical demand in the national economy with: Constant sitting; Frequent fingering/typing/keyboarding; occasional standing, walking, handling/gripping/grasping, and reaching at desk/waist level; and No reaching upward/above shoulder level, reaching downward/below shoulder level, climbing, balancing, bending/stooping, crouching/squatting, or kneeling.

The Department of Labor defines Sedentary Work as,

> ***S-Sedentary Work*** *- Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.*

Further the vocational review stated in part,

> *In my vocational experience, ergonomic workstations are standard practice and recommended by most employers. Standard breaks exist approximately every two hours for 10-15 minutes and a lunch is provided approximately every four hours for approximately 30-60 minutes. The availability of any accommodations (e.g. additional breaks with extended workday) would be a consideration for a prospective employer to implement. However, such accommodations would not appear to interfere with any material and substantial duties if permissible by the employer.*

Taking into consideration the clinical and vocational reviews completed for your appeal, we determined that you would not be precluded from performing your own occupation as performed within the national economy.

On July 09, 2025, we sent you a letter which included a copy of the clinical and vocational reviews performed in connection with your request for appeal. You were given an opportunity to review and respond with any additional information that you would like considered before a final determination was made on the appeal. A deadline for response was given of July 30, 2025.

In an email dated July 16, 2025, you requested an extension of time to respond to the appeal review. In a letter to you dated July 18, 2025, we requested you notify our office of the length of time you were requesting for an extension and the rationale for why additional time is needed. We advised we would review and consider your detailed extension request upon receipt.

In an email dated July 22, 2025, you reported that you would require additional time to provide information for your appeal. In a letter dated July 24, 2025, you were afforded an extension until August 07, 2025 to provide a response to the clinical and vocational reviews that were completed in connection with your appeal and any additional documentation you wished to have considered.

In an additional email dated July 24, 2025, you reported that you would require an extension to August 25, 2025 to provide additional information including imaging results, EMG testing, x-ray results, sleep testing, as well as to attend an "eye appointment to get questions answered". In a letter to you dated July 25, 2025, we granted an extension through August 25, 2025 for you to submit any additional information you wished to have considered.

In a letter dated August 18, 2025, you reported your care was being escalated for spine, vision, and migraines. You stated there were some issues going on with your vision and you were scheduled for an appointment to see a specialist the following month. You stated that it is your position that you cannot return to your occupation "due to visual blurriness, uncontrolled blood pressure that effects vision, unpredictable headache, and spine pain." You stated you were awaiting sleep test results and an ultrasound was pending. You reported you cannot sit due to fibroid pain and bleeding. You asked that the claim be reopened.

An additional letter received on August 18, 2025 indicated you would be submitting new evidence from January 01, 2025 – August 18, 2025 of "continued medical issues and proof conditions have not improved." You advised you worked in sedentary roles for over 10 years constantly sitting, typing, and doing near work. You stated you experienced the first episode of vertigo in February 2023. You discussed your prior appeal in April 2024 and the approval of your Long Term benefits. You discussed that your benefits were stopped abruptly "when there were not records of improvement." You opined the only evidence it appears Lincoln based this decision off was "a fax of a "summarized" conversation with their paid peer doctor." You stated there is "no evidence that disabling headaches or spine and vision issues resolved. In fact, new medications for headaches, mental health issues had not been fully proven to work long term yet." You discussed your opinion that "No rationale or clear explanation was provided as to why the claim was denied." You discussed concern that your "vision diagnosis was completely overlooked…" You opined that the peer reviews did not provide "much rationale or reason why the restrictions are not supported." You discussed the December 31, 2024 denial letter and stated you "do not see where it disputes any of

my proof or disagrees with my doctors." You stated your migraine attacks are unpredictable and sometimes last 4-72 hours. You reported issues in your spine and visual issues as well. You stated there was not "major resolve in conditions of the spine, dizziness, chronic fatigue, migraines, tension headaches, and mental health issues." You reported that while dealing with medical issues you were also in the middle of a divorce and losing your home due to unstable financial stability. You started you were also dealing with insurance denials of migraine medicine which you stated was later approved. You requested a thorough review of your claim and the accompanying documentation. You stated you were including "all relevant documents that support my appeal, including medical records, receipts, policy documents, or any other pertinent information."

Additional documentation received in support of your appeal included in part:

- Calendars for January 2025 - June 2025 with dots marking the dates you reported experiencing a migraine
- Copy of Ergonomic Report dated August 31, 2023 by Elizabeth Kain, MOT, OTR/L, CEES with Assured Partners
- Encounter Summary dated April 30, 2025 from Erik Romsdahl
- Long Term Disability claim Form Physician's Statement dated July 21, 2025 from Dawn Schissel, MD
- Occupational Analysis Questionnaire dated July 09, 2025 by Dawn Schissel, MD
- Medical records from Vero Health Center dated July 24, 2025 (office of Dr. Logan Dabney, DC)
- Letter dated August 06, 2025 from Dr. Logan Dabney, DC with Vero Health Center
- Progress note dated July 17, 2025, August 11, 2025 from Jordan Creek Family Medicine Clinic, P.C. (office of Dawn Schissel, MD)
- Visit note dated August 11, 2025 from MercyOne Clive Sleep Med Clinic
- Visit note dated August 07, 2025 from Iowa Dermatology Clinic
- Behavioral health records dated August 27, 2024 – August 29, 2025 from Teladoc Physicians, PA
- Migraine summary dated January 02, 2025 – August 15, 2025
- Copies of email messages between yourself and Dr. Logan Dabney dated August 11th and August 12th (year not documented)
- Copies of messaging between yourself and Kara Pasker and Lindy Pelzer dated July 10th – August 13th (year not documented)
- Copies of secure messaging with Iowa Total Care from May 23, 2024 – July 17, 2025
- Copy of email to you from Dr. Julie Steinhauer with Vision for Life & Success
- Copies of undated emails to you from Sweet Grass ICT and Atlanta Anxiety Care

Upon receipt of the additional information submitted in support of your appeal, your file was referred for addendum reviews by independent psychiatrist, Dr. Thomas Finstein and independent neurologist, Dr. Philip McCarthy. The prior ophthalmology reviewer was unavailable to complete an addendum therefore, a new review was completed by Dr. Tracey Lewis, an independent physician Board Certified in Ophthalmology.

Following a review of the additional documentation received, the addendum psychiatry review by Dr. Thomass Finstein concluded there was no change to the prior assessment. Further the review stated in part,

*All of the listed documents have been reviewed; however, only the pertinent records will be commented on.*

*Tracie Shahid*
*07/11/25: Claimant presented with symptoms of depression. Mental status examination was normal with no positive findings or deficits noted. Mood observed to be euthymic. No mention of impairment in functioning or difficulties in ADLs. Diagnosed with MDD, recurrent, moderate.*

*08/01/25: Follow-up therapy visit for depression. Treating with CBT and mindfulness. Normal mental status examination.*

*08/29/25: Follow-up therapy visit. Claimant endorsed frequent migraines. Normal mental status examination.*

*Tuvia Breuer*
*09/23/24, psychiatry visit: Presented for anxiety. Diagnosed with agoraphobia with panic disorder. Mental status examination was unremarkable except for anxious mood. Increased Cymbalta to 60mg and started on Vistaril.*

*07/13/25: Follow-up for anxiety. Mental status examination was unremarkable except for anxious mood. Increased Cymbalta to 120mg.*

*08/07/25: Follow-up for anxiety. Endorsed trouble sleeping. No changes to medications. Normal mental status examination.*

*The additional information does not alter my prior assessment. The new clinical notes show a largely unremarkable mental status examination with no deficits in memory, attention, speech, thought process, thought content, insight, or judgment. There is no indication of severe psychiatric symptoms causing impairment. There is no escalation or referral to a higher level of care, such as IOP, PHP, or inpatient hospitalization. There is no self-report of severe symptoms or mention of difficulty with ADLs or global functioning from a psychiatric perspective. There is mention of debilitating migraines, but I will defer to my*
*colleagues on this assessment.*

Dr. Finstein posed the following questions for your providers to be facilitated by you:

- *When was the last day you examined your patient, and what mental status examination findings did your patient have at that time?*
- *Do you believe your patient cannot work due to severe psychiatric symptoms? What tasks can she complete? What can she not complete?*
- *What treatment plan is in place to address the medical conditions resulting in a functional impairment and your opined R&Ls?*
- *Have you had any return-to-work (RTW) conversations with your patient, or is there a specific RTW treatment plan currently in place?*
- *Are you aware of your patient's occupational demands, or have you been provided a job description (JD) to review? If yes, do you feel your patient can perform those demands unrestricted?*

- *What does your patient indicate they are most bothered by (i.e., what symptoms), and what do they feel they can and cannot do?*
- *Are any of the claimant's mental health symptoms impairing your patient's ability to perform their routine daily activities of living (ADLs) including independent activities of daily living (IADLs) such as community based functional activities (shopping, driving, socializing, etc.)?*
- *If yes to the above question, what ADLs/IADLs are affected by the claimant's mental health symptoms?*
- *What specific mental health symptoms does your patient currently have? What would you consider the severity of those symptoms to be using the classifications of mild, moderate or severe? (What are or were the observed symptoms and symptoms based on a comprehensive mental status examination and not what was reported to you by your patient).*

Following a review of the additional documentation received, the addendum neurology review by Dr. Philip McCarthy concluded there was no change to the prior assessment. Further the addendum review by Dr. McCarthy stated in part,

> *This addendum is to review additional documentation. Please see the prior report for a more complete clinical summary. All of the listed documents have been reviewed; however, only the pertinent records will be commented on.*
>
> *ENT and audiology evaluations at the University of Iowa (6/4/2025).*
> *Sleep medicine consult and pending sleep study (8/11/2025, and 8/12/2025).*
> *Dermatology evaluation for hidradenitis suppurativa (8/7/2025).*
> *Multiple notes from primary care and urgent care visits addressing ongoing migraines, sleep issues, neck pain, and mood*
> *New and ongoing psychiatric and therapy notes through Teladoc, with continued diagnosis of major depressive disorder, anxiety, and agoraphobia (July-August 2025).*
> *Updated migraine diaries and self-reported functional limitations.*
> *Appeal letters highlighting non-medical stressors (divorce, homelessness), new fibroid diagnosis, and assertions of ongoing functional impairment, especially regarding the ability to perform sedentary work due to visual, vestibular, and musculoskeletal complaints.*
>
> *ENT/Otolaryngology (Kara Pasker, PA-C, note dated 6/4/2025): Vestibular migraine is diagnosed, with recommendations for migraine prophylaxis (nortriptyline), continued physical therapy, sleep study, and further ophthalmology/neurology evaluation. Audiogram reveals only a slight low-frequency hearing loss, not functionally significant.*
>
> *Sleep Medicine (Dr. Wright note dated 8/11/2025): High suspicion of sleep apnea, pending sleep study results. Obesity is noted as a risk factor. Patient reports non-restorative sleep and excessive daytime sleepiness.*
>
> *Dermatology (Christina Warren note dated 8/7/2025): Hidradenitis suppurativa, managed with topical and oral antibiotics.*
>
> *Primary Care/Urgent Care (Dr. Schissel notes dated 7/16/2025 and 8/11/2025): Ongoing headaches, neck pain, vision complaints; new uterine fibroid with menorrhagia; medication adjustments for migraine and muscle relaxants. No acute distress or neurological deficits*

*are documented on exam. No new objective findings of neurological impairment.*

*Psychiatric/Mental Health (July-August 2025): Continued therapy for depression, anxiety, and panic disorder. Symptoms remain moderate but stable, and therapy is ongoing. Mental status exams are largely normal or only mildly impaired (euthymic or anxious mood, full affect, insight/judgement good or fair). No evidence of active suicidality or psychosis. No acute decompensation.*

*An appeal letter dated 8/18/2025 from the claimant was reviewed. The claimant asserts an inability to work due to visual blurriness, unpredictable headaches, neck/spine pain, sleep disturbance, and the effects of fibroids. The claimant reports the negative impact of non-medical stressors (divorce, homelessness). The claimant raises concerns about the lack of clarity from Lincoln regarding job duties and claim requirements. The claimant cites bias in peer reviews and requests further consideration of subjective symptoms and new diagnoses, including hypertensive retinopathy and possible intracranial hypertension (neither of which is clearly documented by treating specialists as functionally impairing in the submitted notes).*

*… No new clinical impairment found:*
*New ENT, audiology, and neurology records do not document objective findings of neurological, vestibular, or otologic impairment that would preclude sedentary work. Audiogram and neurological testing remain essentially normal or non-disabling (ENT visit dated 6/4/2025).*
*Sleep apnea is suspected but not yet confirmed or treated. No evidence is submitted that sleep apnea is currently disabling (Sleep Medicine visit dated 8/11/2025).*

*Psychiatric Function:*
*Mental health notes continue to document mood/anxiety disorders (Psychiatric/Mental health notes from July-August 2025). Impairment comments related to this are deferred to the appropriate specialty.*

*Physical Conditions Managed, Not Impairing:*
*Hidradenitis suppurativa and uterine fibroids are being managed; no treating provider documents that these conditions preclude sedentary work.*
*Ongoing complaints of neck pain, headaches, and visual symptoms are noted, but exams do not reveal new or worsening deficits. Musculoskeletal and vision complaints are being managed with therapy and medication adjustments (Notes dated 7/16/2025 and 8/11/2025 from Dr. Schissel).*

*Self-Reported Symptoms and Non-Medical Issues:*
*The claimant's self-reported symptoms and non-medical stressors (divorce, homelessness, frustration with the claim process) are acknowledged but are not corroborated by clinical functional assessments or provider opinions of impairments.*

*As such, the prior determination remains unchanged, and no impairment is found from a neurological perspective.*

*A Long Term Disability Claim Form, Physicians Statement dated 7/21/2025 from Dr. Schissel was reviewed. The provider noted gaze convergence palsy and migraine headaches*

*as the diagnoses. The provider noted headaches, nausea when reading her computer screen as symptoms. The provider also noted that the claimant has to limit screen time and sitting. The provider noted the claimant is impaired until 1/6/2026. Restrictions noted as working on a computer for an extended time. Limitations noted as Extended time at the computer screen, sitting for prolonged time. Job modifications include limited computer time. The claimant is being treated with visual eye therapy. The provider recommended the following restrictions/limitations: Constant lifting up to 10 lbs. Standing occasionally, walking occasionally, sitting occasionally, balancing never, stooping never, kneeling never, fingering occasionally, crouching never, crawling never, grasping occasionally, climbing never, pushing occasionally, bending occasionally, reaching overhead never, reaching at desk level and below the waist are constant.*

*There were no neurological exam findings that correlated with the restrictions and limitations posed by Dr. Schissel. No restrictions and limitations are supported from a neurological perspective.*

Based on a review of the available medical records, the review by independent ophthalmologist, Dr. Tracey Lewis concluded there was support accommodation for regular breaks following the 20-20-20 rule. Further the clinical review by Dr. Lewis stated in part,

*The claimant is a 40-year-old individual who complains of severe visual strain when working on the computer for extended periods of time throughout the claimant's workday. This eye strain is precipitating migraine headaches. The claimant has been diagnosed with migraine with visual disturbances and convergence insufficiency.*

*Her restrictions and limitations were set as follows: limiting screen time on the computer for extended periods from 12/27/24 until the present. It is recommended that she take regular breaks as follows: These breaks should include using the 20-20-20 rule: every 20 minutes, look at something 20 feet away for 20 seconds, as well as adjusting screen settings for optimal brightness and contrast to reduce eye fatigue and maintain an appropriate distance from screens, ideally 20-30 inches away.*

*Implementing the above should allow the patient to continue working for the full day.*

*The above can be considered accommodations rather than actual restrictions, but without implementation of these recommendations, the patient would not be able to continue working a full day on the computer.*

*The expected duration has been set by the attending physician (12/18/2023 - Dawn Schissel, M.D., 04/11/2025 Dawn Schissel, M.D., 07/21/2025 Dawn M. Schissel, M.D.) through 1/6/26. These restrictions and limitations were confirmed on 02/08/2024 by Gabrielle Magee, O.D..*

*I concur with these limitations and restrictions, as well as the patient undergoing convergence insufficiency visual therapy. Additionally, migraine pharmacologic therapy is recommended.*

*It is difficult to determine if these restrictions and limitations might extend beyond 1/6/26, as the claimant's response to treatment is variable and individualized; however, if the*

*claimant is compliant with convergence therapy treatment and migraine therapy, it is likely that her symptoms will be ameliorated in the allotted time frame.*

*The medical evidence supports that the claimant has the ability to sustain full time capacity with the identified restrictions and limitations from 12/27/2024 until present and through 01/06/2026. Given the below restrictions and limitations below, the claimant should be able to sustain full-time capacity.*

*The claimant is a 40-year-old individual who complains of severe visual strain when working on the computer for extended periods of time throughout the claimant's workday. This eye strain due to convergence insufficiency is precipitating migraine headaches. This diagnosis is confirmed by the optometrist's notes - Gabrielle Magee, O.D. - on 02/08/2024. Given the fact that the claimant is 40 years of age - the claimant may also be commencing with early presbyopia which can exacerbate the claimant's visual symptoms. This is easily correctable with reading glasses - preferably with blue blocking filters to minimize computer eye strain.*

*The claimant's restrictions and limitations were set as follows: limiting screen time on the computer for extended periods from 12/27/2024 until the present. The expected duration has been set by one of the attending physicians (Dr. Dawn Schissel) through 01/06/2026.*

*I concur with these limitations and restrictions as well as the claimant undergoing convergence insufficiency visual therapy - which should incorporate treatment modalities such as:*
*1. Limiting computer screen time is necessary to avoid visual fatigue with resultant migraine due to convergence insufficiency.*
*2. Frequent breaks from using the computer is necessary and should follow the 20-20-20 rule of every 20 minutes, look at something 20 feet away for 20 seconds.*
*Additionally, the claimant should adjust screen settings for optimal brightness and contrast to reduce eye fatigue and maintain an appropriate distance from screens, ideally 20-30 inches away. Magnifying readers with blue block and possible prism are recommended (usually incorporated into convergence insufficiency therapy).*

Dr. Lewis posed the following questions for your providers to be facilitated by you:

*1) Is the claimant a candidate for botulinum toxin therapy for claimant's migraines given that claimant fits the criteria? (greater than 15 migraine days per month lasting 4 hours per day or longer).*

*2) Is it possible to integrate the following therapies into the claimant treatment protocol as regards convergence insufficiency?*

*Use of high magnification readers with blue light filters and possible prism correction to reduce eye strainduring close-up tasks and prevent migraine triggers.*

*Ensure proper lighting to minimize glare on screens and reading materials.*

*Encourage regular breaks using the 20-20-20 rule: every 20 minutes, look at something 20 feet away for 20 seconds.*

*Adjust screen settings for optimal brightness and contrast to reduce eye fatigue.*

*Maintain an appropriate distance from screens, ideally 20-30 inches away*

Your claim was also referred for an addendum occupational analysis to take into consideration the additional recommendations outlined per the ophthalmology peer review by Dr. Tracey Lewis. The Board Certified Vocational Expert noted the following in the addendum review:

*The above recommendations would amount to a total of one minute every hour of time looking away from screens. This can be accomplished even during the process or normal work tasks like talking on the phone and would not require a full work stoppage (although this, too, can be done during times of bathroom use, normal breaks, lunch, etc.). In fact, brief periods of looking away from screens can be accomplished even more often than this for shorter periods, as well, that may serve to add to the 20-20-20 rule. Brightness and contrast of screens can certainly be adjusted and the screen can be placed at 20-30 inches. Magnifying readers with blue blocking/prism can also be obtained and will not cause any interference with performing the material and substantial duties of the occupation.*

On September 22, 2025, we received an email from you which included a copy of your office visit note dated September 21, 2025 from UnityPoint Clinic Express Waukee Kettlestone. The September 21, 2025 note indicates you were seen due to a headache related to a fall from a ladder the night prior at which time you hit the left temporal and posterior side of head as well as left shoulder. The injury sustained on September 20, 2025 occurred well after your benefits ceased on December 26, 2024 and would not alter our prior assessment regarding continued disability for the period of December 27, 2024 forward.

On September 23, 2025, we sent you a letter which included a copy of the additional clinical and vocational reviews performed in connection with your request for appeal. You were given an opportunity to review and respond with any additional information that you would like considered before a final determination was made on the appeal. A deadline for response was given of October 07, 2025.

In our letter to you dated September 23, 2025 we also discussed that during the ongoing evaluation of your claim, your file was previously reviewed by a Physical Medicine & Rehabilitation physician. During telephone contact with your provider, Dr. Dawn Schissel on September 11, 2024, information received from your provider indicated that reasonable restrictions and limitations related to cervicalgia would include no lifting over 20 pounds. No other restrictions and limitations related to cervicalgia were noted by your provider and she advised that most of your limitations were coming from your convergence insufficiency. Additional correspondence received from Dr. Schissel dated April 11, 2025 and July 21, 2025 opined that you have to limit screen time and sitting, however, there was no new clinical evidence submitted to support that you are limited from sitting due to a musculoskeletal condition or “spinal issues” as of December 27, 2024. Additionally, the neurology peer review addendum sent to you on September 23, 2025 noted that while you have

reported ongoing complaints of neck pain, exams did not reveal new or worsening deficits. Further we discussed that in the current employment environment, and as a result of technological advancement, employers are providing a variety of workstation types and associated equipment that allow individuals opportunity to experience and sustain comfort in their respective work settings within the occupations. In regard to sleep apnea, as of June 04, 2025, medical records from Kara Pasker, PA-C indicated you had not been diagnosed with sleep apnea although had received complaints about snoring. You reported sometimes not feeling well rested after sleeping and frequently feeling tired during the day. An order was placed for a Home Sleep Apnea test and you were referred to UI Sleep Center to evaluate for obstructive sleep apnea. Medical records from Dr. Dawn Schissel dated July 17, 2025 indicated you reported sleep disturbances and the assessment documented a diagnosis of organic sleep apnea. On August 11, 2025 you were seen by Dr. J Wright at MercyOne Clive Sleep Med Clinic. Dr. Wright documented high suspicion of sleep apnea, pending sleep study results. In our letter to you dated September 23, 2025, we discussed that while medical records as of June 04, 2025 discuss suspicion for sleep apnea, this was well after your benefits ceased on December 27, 2024 and would not alter our prior assessment related to your level of functional capacity as of December 27, 2024. Additionally, the neurology peer review addendum concluded there is no evidence that sleep apnea is currently disabling. We explained that in summary, the information currently contained in your file does not change the determination to deny benefits beyond December 26, 2024.

In correspondence received from you on September 24, 2025, you complained of "harsh claim handling and disregard for medial proof that supports limitations." You indicated you planned to submit additional information in connection with your appeal by September 26, 2025. You further discussed your disagreement with the denial in December 2024. You requested a full and fair review of ER records, urgent care records, mental health records and sleep study results. You discussed documentation which has been submitted to date as proof regarding restrictions to limit sitting and computer use.

On September 26, 2025, we received a response from you discussing that case laws allow subsequent evidence during appeal. You stated that sleep apnea and fatigue relate back to the initial claim. You requested that "all" records be reviewed at this time. You stated that a treating doctor has agreed this is currently disabling and treatment is underway as a CPAP machine was discussed on a recent phone call. You stated that Dr. Schissel has reviewed the most recent spine records, x-ray, and nerve test and imposed restrictions for not sitting more than four hours. The letter indicated you had previously asked "to be in the loop with all communications" to your treating doctors and "this was not fulfilled." You stated "the doctor also does not agree with a mere 20 second break and has advised 30-minute breaks." You requested that the peer doctors review and respond to new spine evidence. You noted your disagreement with the findings of the clinical and vocational reviews completed in connection with your appeal.

Additional documentation submitted in support of your appeal included in part:

- Copy of a message from Ms. T Shahid which stated they do not complete disability forms on the Teladoc app, however, she stated this does not mean she believes you can return to work right now
- Response to a questionnaire labeled as "RE: Medical Records and Functional Capacity for

Sharilyn Ervin" completed by Dr. Dawn Schissel dated September 25, 2025

- Migraine calendars for February 2025 – June 2025 and September 2025
- Behavioral health records from Teledoc Physicians, P.A. dated September 12, 2025 – October 06, 2025
- Home sleep test result, study date: September 08, 2025
- Literature/articles regarding sleep apnea
- Letter received via email on September 27, 2025 related to "Concerns regarding sleep apnea, fatigue, spine, and pelvic pain"
- Document received via email on September 30, 2025 labeled as "The Facts prove screen breaks are needed and needed frequently making it impossible to work 8-hour shift"
- Document received via email October 03, 2025 reiterating the reasons you disagree with the decision made on your claim as well as the handling of your claim
- Office visit note and After Visit Summary dated October 01, 2025 from MercyOne Clive Sleep Med Clinic
- Telemedicine progress note dated October 04, 2025 from UnityPoint Clinic Virtual Urgent Care

The additional documents received do not provide significant new clinical findings that would alter the previous assessment.

The additional information received with your appeal, including your statements and the information from your providers, has been considered. We acknowledge your complaints and have considered them, in conjunction with the medical findings, and find based on the totality of the evidence, the additional information received on appeal does not provide significant exam findings, or information regarding your diagnoses, treatment frequency, treatment plan or functional status to change the prior assessment.

**Conclusion**

We conducted a thorough and independent review of your entire claim. In summary, we acknowledge that you may have continued to experience some symptoms associated with your condition beyond December 26, 2024. However, the information does not contain significant exam findings, test results or other forms of medical documentation supporting your impairments and symptoms remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering you unable to perform the duties of your occupation after that date.

Having carefully considered all of the information submitted in support of your claim, our position remains that proof of your continued disability in accordance with the Policy provisions has not been provided. Therefore, no further benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**<u>Policy Provisions</u>**

In order to continue receiving benefits, you must satisfy the requirements of all Policy provisions that state, in part:

***Disability Benefit***

*When Lincoln receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Lincoln will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Lincoln Proof of continued:*

*1. Disability;*
*2. Regular Attendance of a Physician; and*
*3. Appropriate Available Treatment.*

*The Proof must be given upon Lincoln's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Lincoln will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

*For purposes of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage.*

***"Disability"*** *or* ***"Disabled"*** *means:*

*Applicable to Class 1, 2:*

*a. if the Covered Person is eligible for the Maximum Own Occupation benefit,* ***"Disability"*** *or* ***"Disabled"*** *means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation.*

***"Material and Substantial Duties"*** *means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.*

***"Own Occupation"*** *means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Lincoln will consider the Covered Person's occupation as it is normally performed in the national economy.*

***"Proof"*** *means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

*1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
*2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
*3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*

*Proof must be submitted in a form or format satisfactory to Lincoln.*

***Discontinuation of the Long Term Disability Benefit***

*The Monthly Benefit will cease on the earliest of:*

…
*8. the date the Covered Person is no longer Disabled according to this policy;*
…

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, you were entitled to appeal the decision made by The Lincoln National Life Insurance Company (Lincoln), and to submit any additional information you wished to be considered as part of the appeal. Lincoln has conducted a full and fair review of your appeal and accompanying materials, and has concluded that the denial of benefits will be maintained.

At this time, your administrative right to review has been exhausted; no further review will be conducted by Lincoln and your claim will remain closed. You may request to receive, free of charge, copies of all documents relevant to your claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

The Wellmark, Inc. Group Disability Income Policy contains the below provision:

***Legal Proceedings***

*A claimant or the claimant's authorized representative cannot start any legal action:*
*1. until 60 days after Proof of claim has been given; or*
*2. more than one year after the time Proof of claim is required.*

If your plan is subject to ERISA, you may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office or your state insurance regulatory agency. In addition, once all required reviews of your claim have been completed, you have the right to bring a civil action under applicable law. Your employer's plan has a contractual limitations period of one year, which means that a lawsuit must be brought within one year after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is December 26, 2025.

This information is provided for purposes of this claim only, as the time proof of claim is required may differ based on claim specifics and applicable policy language.

Nothing in this letter should be construed as a waiver of any Lincoln rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Lincoln are based on the provisions outlined in the Wellmark, Inc. LTD Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities. No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact Lincoln to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłį́į' dóó ná'ookąąh nííní'ą́ągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtį́įł nínízingo doo bą́ąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Tawnya V.
Claim Resolution Specialist
Phone No.: (888) 437-7611 Ext. 15894
Secure Fax No.: (603) 334-0401